KAMALA D. HARRIS
Attorney General of California
NICKLAS A. AKERS
SALLY MAGNANI
ROBERT W. BYRNE
Senior Assistant Attorneys General
JUDITH A. FIORENTINI
DAVID A. ZONANA
GAVIN G. MCCABE
Supervising Deputy Attorneys General
AMOS E. HARTSTON (SBN 186471)
JOHN S. SASAKI (SBN 202161)
WILLIAM R. PLETCHER (SBN 212664)
JON F. WORM (SBN 248260)
ELIZABETH B. RUMSEY (SBN 257908)
Deputy Attorneys General
  600 West Broadway, Suite 1800
  San Diego, CA  92101
  Telephone:  (619) 738-9325
  Fax:  (619) 645-2271
  E-mail:  jon.worm@doj.ca.gov
*Attorneys for Plaintiff the People of the State of
California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA,**<br><br>Plaintiff,<br><br>**v.**<br><br>**VOLKSWAGEN AG;  VOLKSWAGEN GROUP OF AMERICA, INC.; VOLKSWAGEN GROUP OF AMERICA CHATTANOOGA OPERATIONS LLC; AUDI AG; DR. ING. H.C. F. PORSCHE AG; and PORSCHE CARS NORTH AMERICA, INC.,**<br><br>Defendants. | Case No.<br><br>**CIVIL ENFORCEMENT COMPLAINT FOR PERMANENT INJUNCTION, CIVIL PENALTIES, RESTITUTION, AND OTHER LEGAL AND EQUITABLE RELIEF** |

1

1    The People of the State of California (the "People"), both by and through Kamala D. Harris,

2  Attorney General of the State of California, and by and through the California Air Resources

3  Board, represented by the Office of the California Attorney General (collectively "Plaintiff"),

4  bring this civil law enforcement action against the following Defendants: (1) Volkswagen

5  Aktiengesellschaft ("VWAG"), Volkswagen Group of America, Inc. ("VWGofA"), and

6  Volkswagen Group of America Chattanooga Operations LLC ("VW Chattanooga"); and (2) Audi

7  Aktiengesellschaft ("Audi AG") (these Volkswagen and Audi Defendants are collectively

8  referred to as "Volkswagen"); and (3) Dr. Ing. h.c. F. Porsche Aktiengesellschaft ("Porsche AG")

9  and Porsche Cars North America, Inc. ("Porsche America") (these Porsche Defendants are

10  collectively referred to as "Porsche").  Plaintiff alleges the following on information and belief:

11                                      **INTRODUCTION**

12    1.    For years, Volkswagen has used sophisticated technology to evade California and

13  federal emissions standards for its supposedly "clean" diesel vehicles and to mislead California

14  consumers.  Volkswagen has admitted that, since at least 2008, it used engine control systems in

15  its diesel vehicles to cheat on emissions testing.  Volkswagen's "defeat devices" (as these

16  devices are commonly called) detect whether a vehicle is being tested, and, if it is, temporarily

17  control the engine performance—for the duration of the test—so that emissions appear to be

18  within legal limits.  Under real-world driving conditions on the road, however, the vehicles

19  function in a much different manner, spewing harmful nitrogen oxides ("NOx") into the air at up

20  to 40 times the legal limits under California and federal law.

21    2.    Volkswagen used these defeat devices to mislead regulators, obtaining

22  certifications in the form of California Executive Orders ("Executive Orders") from the

23  California Air Resources Board ("CARB"), to sell its non-compliant 2.0 and 3.0 liter diesel

24  vehicles in California, as well as obtaining certifications from the Environmental Protection

25  Agency ("EPA") to sell these same vehicles in California and other states.  Porsche obtained

26  engines from Volkswagen that contained undisclosed auxiliary emission control devices and/or

27  defeat devices and used them in its 3.0 liter diesel vehicles.  Through its years of emissions

28  cheating, Volkswagen and Porsche have introduced, or caused to be introduced, approximately

87,000 non-compliant 2.0 and 3.0 liter vehicles ("Subject Vehicles") into California, which in turn have emitted thousands of tons of excess NOx and other toxic pollutants year after year, damaging California's environment and public health and hindering California's ability to attain compliance with increasingly stringent health-based federal ambient air quality standards.

3.      Volkswagen not only lied to regulators but also consistently misled consumers through pervasive marketing campaigns.  Setting aside for the moment that any advertisement or offer for sale of these vehicles was unlawful and deceptive because the vehicles did not comply with the relevant Executive Orders, these advertising campaigns falsely described Volkswagen's non-compliant diesel vehicles as "clean," "green," and otherwise environmentally friendly.

4.      Volkswagen repeatedly highlighted in its consumer marketing that its diesel vehicles met California's emissions standards, which the vehicles could only do by activating their cheat mode under test conditions.  Volkswagen also improperly claimed improved performance and fuel economy (including claims of fuel economy in the extremely attractive 40-50 miles per gallon range).  But the cars only achieved these attributes because the vehicles were able to provide "enhanced" performance in everyday, real-world driving when the emissions testing cheat mode was turned off—in other words, when the vehicle employed limited (or non-existent) emissions controls.  As just one example, in an October 2008 press release promoting its newly-released diesel Jetta, Volkswagen claimed it had engineered a hyper-efficient diesel vehicle that could also meet strict California emissions limits:

> The Jetta TDI is amongst the ten most fuel efficient vehicles on the US market. . . . Moreover, the Jetta Clean TDI also fulfills stringent Californian emission standards.  This was achieved through modifications within the engine and by implementing an exhaust treatment system developed especially by Volkswagen and which reduced nitrogen oxide emissions (NOx) by up to 90 percent.  The central element of the exhaust treatment system is the NOx storage catalytic converter.

5.      Volkswagen directed much of its advertising toward "environmentally conscious" consumers, taking advantage of these consumers' desire to drive a car that would minimize pollution.  Volkswagen also directed its advertising toward cost-conscious consumers who were concerned about the high costs of fuel.  In 2012, gasoline prices were nearly $6 per gallon in parts of California.  As Volkswagen has now admitted, its non-compliant vehicles do not possess

3

the qualities it told consumers they possessed.  The environmental "friendliness" for which consumers paid a premium never actually existed.  And, on top of that, with the revelations of Volkswagen's deception, the resale value of consumers' vehicles has decreased significantly.

6.       The State of California was especially harmed by Volkswagen's misconduct for at least two critical reasons.  First, Volkswagen repeatedly misled CARB, a pioneer among government agencies in air pollution control.  To combat dangerous levels of air pollution, California was the first state to regulate tailpipe emissions.  California's environmental air-quality regulations precede the federal Clean Air Act ("CAA"), and California has retained authority to set and enforce its own air quality standards, which must be at least as stringent as those enforced by the EPA (but can be more stringent and broader in scope).  Because California has exercised its authority to set its own emissions standards, for Volkswagen's emissions cheating to succeed, it not only needed to mislead its federal regulator, EPA, but it also needed to deceive CARB.  Second, California consumers make up the largest auto market in the United States, and a significant portion of the affected vehicles were sold in California to California consumers.

7.       Volkswagen falsely represented to CARB that its vehicles met California's emissions standards, and it continued to make false statements to CARB even after the emissions anomalies were discovered.  In connection with CARB's ongoing investigation, Volkswagen ultimately was forced to admit to CARB its illegal use of defeat devices to cheat on emissions testing and its sale of tens of thousands of vehicles that do not meet California's emission standards.

8.       California's residents have suffered—and will continue to suffer—disproportionate harm from Volkswagen's misconduct.  NOx in the atmosphere can lead to the formation of ozone, smog, and particulate matter, among other things, all of which are severe problems in California and harmful to its residents' health.  For many years, California has had the most cars on the road as compared to other states, and this, combined with other factors such as population density and topography, make California especially vulnerable to severe air pollution.

4

1    9.      Volkswagen and Porsche imported, delivered, purchased, received, acquired,

2    leased, rented, sold, and/or offered to sell, lease, or rent approximately 87,000 of the Subject

3    Vehicles in California—more than any other state—under the brands Volkswagen, Audi, and

4    Porsche; these non-compliant diesel cars continue to pollute the air in California.  Thus, while

5    California has gone to great lengths and committed significant resources to reduce air pollution

6    from vehicles and protect its residents, its efforts have been, and will continue to be,

7    compromised by excess pollution emitted by these diesel vehicles.  Even if Volkswagen and

8    Porsche could bring the vehicles into environmental compliance, due to the way Volkswagen

9    designed its AECDs and/or defeat devices, this would reduce the vehicles' fuel economy and

10   have other adverse performance effects.  In either case, California and its residents will continue

11   to suffer from Volkswagen's deception.

12   10.     California's residents and others have suffered additional harms as a result of

13   Volkswagen's misconduct.  For example, CARB has implemented programs to encourage zero-

14   emissions vehicles ("ZEVs," typically all-electric vehicles) and advanced technology partial

15   zero-emissions vehicles ("AT-PZEVs," typically hybrid or plug-in hybrid vehicles) in

16   California.  Volkswagen marketed its "clean" diesel vehicles as direct competitors to ZEV and

17   AT-PZEV vehicles, even though Volkswagen's cars were not reasonable substitutes or

18   competitors.  Volkswagen thus distorted the market for ZEV and AT-PZEV vehicles, further

19   damaging and undermining California's policies designed to encourage ZEV and AT-PZEV

20   technologies to protect California's citizens and environment.

21   11.     Volkswagen's misconduct also undermines CARB's efforts to regulate and

22   monitor tailpipe emissions, damages the trust between CARB and the automobile industry, and

23   damages the public's trust in corporate environmental compliance generally.

24   12.     For all of these reasons, Plaintiff brings this action to hold Volkswagen and

25   Porsche accountable for the harm they have caused to California's environment, its residents,

26   and its consumers, as well as for the damage done to the fundamental integrity of California's

27   governmental processes.  Through this action, the People of the State of California, both by and

28   through Kamala D. Harris, Attorney General of the State of California, and by and through the

5

1  California Air Resources Board, represented by the Office of the California Attorney General,

2  seek an order preliminarily and permanently enjoining Volkswagen and Porsche from violating

3  California emission control statutes and regulations and from engaging in unlawful, unfair, and

4  fraudulent practices; seek restitution for California consumers; and seek civil penalties along

5  with other appropriate relief.

6  **JURISDICTION**

7      13.    The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

8  because Plaintiff asserts claims under the Consumer Financial Protection Act of 2010 ("CFPA"),

9  12 U.S.C. § 5552.  The Court has supplemental jurisdiction over all other claims under 28 U.S.C.

10  § 1367.  The other claims alleged are so related that they form part of the same case or

11  controversy under Article III of the United States Constitution.

12      14.    The Court has personal jurisdiction over each of the Defendants under California

13  Code of Civil Procedure § 410.10, because they all transact business in California and within this

14  District.  In addition, the Court's exercise of jurisdiction over each of the Defendants is

15  consistent with due process.

16  **VENUE**

17      15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a

18  substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this

19  District.  Among other things, Volkswagen and Porsche have marketed, sold, and leased their

20  diesel vehicles within this District, and Volkswagen and Porsche dealers are located in this

21  District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1407 and the Judicial Panel

22  on Multidistrict Litigation's Transfer Order, dated December 8, 2015.  In that December 8, 2015

23  order, the Judicial Panel on Multidistrict Litigation determined that centralization of claims

24  related to the Volkswagen defeat devices "in the Northern District of California will serve the

25  convenience of the parties and witnesses and promote the just and efficient conduct of litigation"

26  and that centralization in California and in this District was particularly appropriate "given the

27  role played by the California Air Resources Board in uncovering V[olkswagen]'s use of defeat

28  devices on its diesel engines."

**ASSIGNMENT TO SAN FRANCISCO DIVISION**
**AND AUTOMATIC PRETRIAL CONSOLIDATION WITH MDL NO. 2672**

16.     This action is properly assigned to the San Francisco Division under Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in San Francisco County.  Further, this action is filed as an original action in this District in connection with the multidistrict litigation proceedings designated MDL No. 2672, which have been assigned to Judge Charles R. Breyer, presiding in the San Francisco Division of this District.

17.     Judge Breyer's Pretrial Order No. 1 in MDL No. 2672 provides that new actions filed directly in the Northern District of California and related to those actions originally transferred as part of MDL No. 2672 "will automatically be consolidated with this [MDL] without the necessity of future motions or orders."

## PARTIES

### I.  PLAINTIFF

18.     The California Air Resources Board ("CARB") is a public agency of the State of California within the California Environmental Protection Agency.  Among other duties and responsibilities, CARB is charged with controlling motor vehicle emissions to systematically attack the serious air pollution problems they cause.  To that end, California Health and Safety Code §§ 43101 and 43104, among others, specifically direct CARB to adopt and implement emission standards for new motor vehicles, and test procedures and any other procedures necessary to determine whether the vehicles or engines are in compliance with those emissions standards.  California Health and Safety Code § 43017 authorizes CARB to bring a civil action to enjoin any violation of Division 26, Part 5 (§§ 43000-44299.91, Vehicular Air Pollution Control) of the California Health and Safety Code and/or any CARB rule or regulation (and expressly excepts CARB from any requirement that it allege inadequate remedy at law, irreparable damage, or loss to obtain the requested injunction).  Further, California Health and Safety Code §§ 43016, 43211, and 43212 subject any person who violates those emissions standards, test procedures, or any other CARB regulation to civil penalties.  This action is thus

7

brought, in part, by the Attorney General at the request of CARB and in the name of the People of the State of California.

19.     Separately, under the Constitution of the State of California and based on specific independent statutory authority, Kamala D. Harris, Attorney General of the State of California ("CAAG"), is authorized generally to bring suit and obtain relief on behalf of the People of the State of California.

a.     Pursuant to 12 U.S.C. § 5552(a)(1), the CAAG is authorized to enforce provisions of the CFPA.  The CAAG is authorized to enforce 12 U.S.C. § 5536, which, among other things, prohibits deceptive acts or practices in connection with consumer financial products or services. Pursuant to 12 U.S.C. § 5565, the CAAG may seek, among other things, rescission or reformation of contracts, refunds, restitution, disgorgement, damages, or other monetary and injunctive relief.

b.     The CAAG is also authorized to act in the name of the People of the State of California by California Business and Professions Code § 17204 and by California Business and Professions Code § 17535, to obtain injunctive relief to halt violations of, and enforce compliance with, California Business and Professions Code § 17200 et seq., and California Business and Professions Code § 17500 et seq., respectively, and is authorized by California Business and Professions Code §§ 17206 and 17536 to obtain civil penalties of up to $2,500 for each violation of §§ 17200, 17500, and 17580.5.  The CAAG is also authorized under California Government Code § 12607 and California Civil Code § 3494 to obtain preliminary and permanent injunctions to abate any public nuisance present in the State of California as defined by California Civil Code §§ 3479 and 3480.  The CAAG's claims are separate and independent from the claims asserted on behalf of CARB.

## II.   DEFENDANTS

20.     Defendant Volkswagen Aktiengesellschaft ("VWAG") is a multi-national automotive manufacturing company that manufactures, markets, and sells vehicles worldwide through various subsidiaries and under various brands, including Volkswagen, Audi, Porsche, and others.  VWAG is a German corporation and headquartered in Wolfsburg, Germany.  At all relevant times, VWAG has transacted and continues to transact business throughout California,

8

1    including in this District.  VWAG, either directly or indirectly, arranged for sale or delivery of

2    its diesel vehicles under the brands Volkswagen, Audi, and Porsche, among others, to the United

3    States for sale throughout the United States, including in California and this District.  VWAG

4    also provides, furnishes, or arranges consumer financing for automobile purchases and leases,

5    either directly or through its wholly-owned subsidiaries.  Additionally, VWAG has regularly

6    submitted information to CARB, either directly or through its subsidiaries, including

7    applications for Executive Orders.  As described below, VWAG must obtain an Executive Order

8    from CARB to sell or lease its vehicles in California.  VWAG has also regularly participated in

9    meetings with CARB, including in person, via telephone, or through videoconferencing

10   technology.  VWAG has also regularly corresponded or otherwise communicated with CARB.

11        21.     Defendant Volkswagen Group of America, Inc. ("VWGofA") is wholly-owned by

12   VWAG.  VWGofA is incorporated in New Jersey and headquartered in Herndon, Virginia.  It is

13   VWAG's principal North American subsidiary and does business or operates in all 50 states and

14   the District of Columbia, marketing and selling cars through approximately 1,000 dealers.  At all

15   relevant times, VWGofA has transacted and continues to transact business throughout

16   California, including in this District.  VWGofA operates several major facilities in California,

17   including an Emissions Compliance Lab and Test Center in Oxnard, an Electronics Research

18   Laboratory in Silicon Valley, and a regional sales office in Woodland Hills.  In addition to other

19   brands, VWGofA sells Volkswagen and Audi vehicles.  VWGofA has advertised and sold diesel

20   vehicles within this District and throughout California.  Additionally, VWGofA has regularly

21   submitted information to CARB, including applications for Executive Orders.  As described

22   below, VWGofA must obtain an Executive Order from CARB to sell or lease its cars in

23   California.  VWGofA has also regularly participated in meetings with CARB, including in

24   person, via telephone, or through videoconferencing technology.  VWGofA has also regularly

25   corresponded or otherwise communicated with CARB.  VWGofA also provides, furnishes, or

26   arranges consumer financing for automobile purchases and leases, either directly or through its

27   wholly-owned subsidiaries.  VWGofA provides financial services to United States retail

28   customers and dealers, including extending credit in connection with the lease or purchase of

9

Volkswagen and Audi brand automobiles.  As part of making and servicing consumer financial products, VWGofA (either directly or through its wholly-owned subsidiaries) has marketed these products and regularly corresponded and communicated with California consumers concerning these financial products.

22.     Defendant Volkswagen Group of America Chattanooga Operations LLC ("VW Chattanooga") operates a 1,400 acre manufacturing plant in Chattanooga, Tennessee, with more than 3,000 employees.  VW Chattanooga was formed in connection with VWAG's decision to open a manufacturing plant in Chattanooga.  VWGofA is the corporate parent of VW Chattanooga, and VWAG claims to have invested more than $1 billion in the Chattanooga plant. Among other things, VW Chattanooga manufactures Volkswagen Passat turbocharged direct injection ("TDI") clean diesel vehicles, and it has an annual production capacity of about 150,000 vehicles.  VW Chattanooga regularly interacts with VWGofA, including in connection with manufacturing.  VW Chattanooga delivered or arranged for delivery of cars within California and the United States.

23.     Defendant Audi Aktiengesellschaft ("Audi AG") is a German corporation headquartered in Ingolstadt, Germany.  It designs, manufactures, markets, and sells automobiles, including under the "Audi" brand.  Audi AG also sold and supplied its 3.0 liter engines to Porsche AG and VWAG for incorporation into the vehicles that were sold or delivered to the United States for sale throughout the United States, including in California and this District.  It is controlled by VWAG, which directly or indirectly owns more than 99.5 percent of Audi AG.  At all relevant times, Audi AG has transacted and continues to transact business throughout California, including in this District.  Audi AG, either directly or indirectly, arranged for the sale or delivery of its diesel vehicles to the United States for sale throughout the United States, including in California and this District.  Either directly or through its wholly-owned subsidiary, Audi of America, LLC, Audi AG has advertised and sold its diesel vehicles in this District and throughout California.  Additionally, Audi AG has regularly submitted information to CARB, including applications for Executive Orders.  Audi AG must obtain an Executive Order from CARB to sell or lease its cars in California.  Audi AG has also regularly participated in meetings

10

1  with CARB, including in person, via telephone, or through videoconferencing technology.  Audi

2  AG has also regularly corresponded or otherwise communicated with CARB.

3  24.  Defendant Dr. Ing. h.c. F. Porsche Aktiengesellschaft ("Porsche AG") is a German

4  corporation headquartered in Stuttgart, Germany.  In August 2009, Porsche Automobil Holding

5  SE ("Porsche SE") and Volkswagen AG reached an agreement to merge the car manufacturing

6  operations of the two companies in 2011, to form an "Integrated Automotive Group."  The

7  management of Volkswagen AG agreed to 50.7% of Volkswagen AG being controlled by

8  Porsche SE in return for Volkswagen AG management taking Porsche SE management positions

9  (in order for Volkswagen management to remain in control) and for Volkswagen AG acquiring

10  ownership of Porsche AG.  Porsche AG is a wholly-owned subsidiary of VWAG and is

11  responsible for the actual production and manufacture of the Porsche automobile line.  Porsche

12  AG designs, manufactures, markets, and sells automobiles under the "Porsche" brand.  At all

13  relevant times, Porsche AG has transacted and continues to transact business throughout

14  California, including in this District.  Porsche AG, either directly or indirectly, arranged for the

15  sale or delivery of its diesel vehicles to the United States for sale or lease throughout the United

16  States, including in California and this District.  Either directly or through its wholly-owned

17  subsidiary, Defendant Porsche Cars North America, Inc., Porsche AG marketed and sold cars

18  throughout California, including in this District.  Additionally, Porsche AG, through Porsche

19  Cars North America, Inc., has regularly submitted information to CARB, including applications

20  for Executive Orders.  Porsche AG must obtain an Executive Order from CARB to sell or lease

21  its cars in California.  Porsche AG, either directly or through Porsche Cars North America, Inc.,

22  has regularly corresponded or otherwise communicated with CARB, and it has participated in

23  meetings with CARB, including in person, via telephone, or through videoconferencing

24  technology.

25  25.  Defendant Porsche Cars North America, Inc. ("Porsche America") is a Delaware

26  corporation with its principal place of business in Atlanta, Georgia.  Porsche America is a

27  wholly-owned subsidiary of Porsche AG.  At all relevant times, Porsche America has transacted

28  and continues to transact business throughout California, including in this District.  Among other

11

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

things, Porsche America has marketed and sold its automobiles in this District and throughout California. Additionally, Porsche America has regularly submitted information to CARB, including applications for Executive Orders. Porsche America must obtain an Executive Order from CARB to sell or lease its cars in California. Porsche America has also regularly participated in meetings with CARB, including in person, via telephone, or through videoconferencing technology. Porsche America has also regularly corresponded or otherwise communicated with CARB.

26. Defendants VWAG, VWGofA, VW Chattanooga, and Audi AG are referred to collectively in this complaint as "Volkswagen."

27. Defendants Porsche AG and Porsche America are referred to collectively in this complaint as "Porsche."

28. VWAG is the ultimate parent of all of the other Defendants in this action. VWAG controlled the other Defendants in this action by, at a minimum, controlling and/or appointing members of their boards of directors and their executive officers. At all relevant times, VWAG acting individually, jointly, and by and through its subsidiaries, committed all of the acts alleged in this Complaint. Employees and officers of VWAG and VWGofA regularly communicated with CARB on behalf of each other and all of the other Defendants.

29. At all relevant times, each Defendant acted individually and jointly with every other named Defendant in committing all acts alleged in this Complaint.

30. At all relevant times, each Defendant acted: (a) as a principal; (b) under express or implied agency; and/or (c) with actual or ostensible authority to perform the acts alleged in this Complaint on behalf of every other named Defendant.

31. At all relevant times, some or all Defendants acted as the agent of the others, and all Defendants acted within the scope of their agency if acting as an agent of another.

32. At all relevant times, each Defendant knew—or should have known—that the other Defendants were engaging in or planned to engage in the violations of law alleged in this Complaint. Despite knowing that the other Defendants were engaging in such unlawful conduct (or despite the fact that they should have known that the other Defendants were engaging in

1    unlawful conduct), each Defendant nevertheless facilitated the commission of those unlawful

2    acts.  Each Defendant intended to and did encourage, facilitate, or assist in the commission of the

3    unlawful acts, and thereby aided and abetted the other Defendants in the unlawful conduct.

4        33.    Defendants have engaged in a conspiracy, common enterprise, and common

5    course of conduct, the purpose of which is and was to engage in the violations of law alleged in

6    this Complaint.  The conspiracy, common enterprise, and common course of conduct continue to

7    the present.

8        34.    The Defendants sold the Subject Vehicles to California Volkswagen, Audi, and

9    Porsche brand dealers.  In turn, these dealers resold the Subject Vehicles to California customers

10   for use, registration, and resale.  In some instances, these dealers leased the Subject Vehicles to

11   California customers for use in California.

12       35.    The violations of law alleged in this Complaint occurred in this District and

13   throughout the State of California.

## BACKGROUND AND FACTUAL ALLEGATIONS

**I.    VEHICLE EMISSIONS ARE A SIGNIFICANT AIR POLLUTION CHALLENGE IN
        CALIFORNIA**

17       36.    California has a long history of severe air pollution.  In simplest terms, California

18   has tens of millions of residents, many of whom travel by automobile, and they are often

19   concentrated in large, urban areas surrounded by mountains.  This topography traps vehicle

20   emissions, many of which are harmful air pollutants, and which also further react with other

21   pollutants and California's abundant sunlight to create ozone (smog), creating a serious air

22   quality problem that is harmful to human health, property, and the environment.  NOx emissions

23   in California are a key contributor to ambient ozone and fine particulate matter pollution, which

24   are associated with premature death, increased hospitalizations, emergency room visits due to

25   exacerbation of chronic heart and lung diseases, and other serious health effects. A major

26   contributor to NOx emissions is combustion from diesel engines and vehicles, such as the

27   Subject Vehicles at issue in this Complaint.

28

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

37.     The emission of air pollutants from motor vehicles is a primary cause of air pollution in many parts of California, and the control and elimination of those air pollutants is of prime importance for the protection and preservation of the public health, property, and the environment.

38.     California has long been at the forefront of researching, investigating, monitoring, and regulating sources of air pollution, including automobile tailpipe emissions.  Beginning in the late 1950s and early 1960s, California enacted the nation's first vehicle emission standards and regulations.  In 1971, California enacted the country's first automobile NOx standards.

39.     CARB was formed in 1967 and is charged with setting and implementing vehicle emissions standards in California.  California is the only state that regulated vehicle emissions before passage of the CAA in 1970, and that statute provides that California is the only state permitted to obtain a waiver from the federal government to adopt and enforce its own emission standards that meet or exceed federal standards (42 U.S.C. § 7543(b)).

40.     Despite California's efforts to combat air pollution over the past half century, many regions of California continue to suffer from some of the worst air quality in the nation.  For example, the Central Valley and Los Angeles air basins remain out of compliance with federal health-based ambient air quality standards that target NOx, particulate matter, and ozone, among other pollutants.  These pollutants negatively affect public health and welfare across a broad demographic spectrum.  California has gone to great lengths to combat air pollution, and it has devoted significant state resources over many years to the effort.

## II.     CALIFORNIA'S REGULATION OF TAILPIPE EMISSIONS

41.     Under its unique, retained authority, California has continued to set strict emissions standards and test procedures for vehicles imported or sold in California.  The People of the State of California have a special interest in assuring that only those new motor vehicles that meet the state's stringent emission standards and test procedures are used or registered in the state.

42.     California Health and Safety Code § 43102 specifies that no new motor vehicle or engine can be certified by CARB unless it meets the emission standards adopted by CARB under

14

the test procedures adopted by CARB.  Section 43106 requires that each new motor vehicle or engine required to meet the emission standards shall be, in all material respects, substantially the same in construction as the test motor vehicle or engine, as the case may be, which has been certified by CARB.  Section 43150 declares that "only those new motor vehicles and new motor vehicle engines which meet this state's stringent emission standards and test procedures, and which have been certified pursuant to this chapter, are used or registered in this state."  The relevant standards for model years 2009 to the present are set forth in title 13, California Code of Regulations ("C.C.R."), §§ 1961 and 1961.2.

43.    For model year 2001 through 2014 vehicles, 13 C.C.R. §§ 1961(d) incorporates by reference the certification requirements and test procedures in the "California 2001 through 2014 Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2009 through 2016 Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks and Medium-Duty Vehicles" ("2001-2014 Test Procedures").  The 2001-2014 Test Procedures require manufacturers to, among other things, list all auxiliary emission control devices ("AECDs," described further below) installed on their vehicles, including a justification for each AECD, the parameters the AECDs sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and a rationale for why the AECD is not a defeat device (40 C.F.R. § 86.1844-01).  The 2001-2014 Test Procedures incorporate 40 C.F.R. §§ 86.1809-01, 86.1809-10, and 86.1809-12, which prohibit the use of a defeat device in any new light-duty vehicle and certain other vehicles.

44.    For model year 2015 and later vehicles, 13 C.C.R. § 1961.2(d) incorporates by reference the certification requirements and test procedures in the "California 2015 and Subsequent Model Criteria Pollutant Exhaust Emission Standards and Test Procedures and 2017 and Subsequent Model Greenhouse Gas Exhaust Emission Standards and Test Procedures for Passenger Cars, Light-Duty Trucks, and Medium-Duty Vehicles" ("2015 Test Procedures").  The 2015 Test Procedures require manufacturers to, among other things, list all AECDs installed on their vehicles, including a justification for each AECD, and a rationale for why the AECD is

15

not a defeat device.  The 2015 Test Procedures incorporate 40 C.F.R. §§ 86.1809-01, 86-1809-10, and 86-1809-12, which prohibit the use of a defeat device in any new light duty vehicle and certain other vehicles.

45.     Central to this action, diesel-fueled vehicles present particular challenges and concerns, including NOx emissions and related smog.  California has set strict vehicle emissions standards to address these concerns and to spark innovations in emissions reduction technologies, such as ZEV and AT-PZEV technologies.

46.     California law requires that each make and model year of vehicle comply with California's emissions standards and be certified by CARB before being imported, delivered, purchased, acquired, received, offered, rented, leased, or sold for use, registration, or resale in California.

47.     California Health and Safety Code §§ 43151, 43152, and 43153 generally prohibit importing, delivering, selling, or leasing new motor vehicles for use, registration, or resale in California, or attempting or assisting in any of the above such acts, unless such motor vehicles have been certified by CARB and comply with California's emissions standards and other requirements.

48.     CARB administers a certification program designed to prevent the introduction of new motor vehicles into California that do not satisfy applicable emission standards.  Under this program, CARB certifies new motor vehicles for sale in California after reviewing the applications and issuing Executive Orders.

49.     To obtain an Executive Order, a manufacturer must submit an application to CARB for each model year and for each test group of vehicles that it intends to import, deliver, purchase, rent, lease, acquire, receive, or sell in California.  Manufacturers are prohibited from doing so unless such motor vehicles have been certified through an Executive Order issued by CARB.

50.     To be certified, a vehicle manufacturer must demonstrate that each vehicle's exhaust and evaporative emission control systems are durable and comply with the applicable emission and evaporative emission standards for the vehicle's useful life.  This is done through

durability and certification testing of sample vehicles.  This certification process is comprehensive and includes evaluation of compliance with numerous separate requirements, including on-board diagnostics (i.e., the "check engine" light), anti-tampering, labeling, warranty, fuel tank fill-pipe and openings, in addition to tail-pipe emissions.

51.     California's certification requirements and test procedures require, among other things, that an automobile manufacturer disclose in its certification applications all auxiliary emission control devices ("AECDs") used in the vehicle.  An AECD is any element of design that senses temperature, motive speed, engine RPM, transmission gear, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system.  All AECDs must be disclosed, so that CARB may properly evaluate them for, among other things, their effect on emissions, their purpose, and their effect on other components and durability.

52.     California's certification requirements and test procedures also prohibit the use of all "defeat devices," i.e., those devices that circumvent or reduce the effectiveness of the emission control system under normal vehicle operation.  Vehicles equipped with defeat devices—a prohibited type of AECD—may not be certified.

53.     California's certification requirements and test procedures further require an on-board diagnostic ("OBD") system that meets certain requirements, designed to test that the emissions control system is working properly throughout its useful life and, when a malfunction is detected, to alert owners via a "check engine" light of needed  service and to inform mechanics of the cause of the malfunction.  In fact, most newer cars (model year 2000 and newer) no longer require tailpipe testing during smog checks; these cars are now simply connected to an OBD scanner to detect malfunctions.  Because of this reliance on OBD scans to detect problems, if the OBD system is not operating properly (or was never designed to operate properly), the vehicles will likely pass smog checks even though they possess significant problems.

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

### III.   VOLKSWAGEN DEVELOPED AND INSTALLED DEFEAT DEVICES IN DIESEL VEHICLES

54.     According to Volkswagen, in 2005, it decided to launch a large-scale effort to promote its diesel vehicles in the United States.  Volkswagen viewed the development of its EA 189, turbocharged direct injection diesel ("TDI") engine as central to its goal to increase sales significantly in the United States.  The EA 189 engine was intended to offer fuel economy that approached that of hybrid vehicles, but with better drivability and performance (e.g., horsepower, torque), all while purportedly complying with strict emissions standards set by CARB and the EPA.

55.     While diesel engines have the potential to offer better fuel economy than comparably sized gasoline engines, along with increased power, the combustion process also leads to greater production of NOx and particulate matter, both of which are harmful pollutants and subject to strict emissions limits set by CARB and the EPA.

56.     There are several NOx reduction technologies that can be used to reduce NOx in diesel vehicles, including the following:

a.     **Exhaust gas recirculation ("EGR").**  Through this process, a portion of the exhaust gas (which has lower oxygen content) is fed back into the combustion chamber, lowering the combustion temperature inside the cylinder.  This reduces the rate of NOx formation, but it can also increase the level of particulate matter produced by the combustion.

b.     **Selective Catalytic Reduction ("SCR").**  SCR uses an aqueous urea solution, also known as diesel exhaust fluid ("DEF"), as a reducing agent.  The fluid is stored in a separate tank in the vehicle that requires periodic refilling.  The DEF reacts in the exhaust to produce ammonia and carbon dioxide.  The NOx reacts with ammonia to yield nitrogen and water.

c.     **Lean NOx trap ("LNT")**.  An LNT is a device that combines oxidation and reduction catalysts with a NOx absorber.  When the LNT is saturated with NOx, fuel is injected, and NOx is desorbed and reduced to nitrogen and oxygen.  Unlike SCR, no external reducing agents are required.

57.     In its initial EA 189 engine, Volkswagen used EGR and LNT technologies to purportedly reduce NOx emissions.  Some of Volkswagen's other 2.0 and 3.0 liter diesel engines used SCR technology to purportedly reduce NOx emissions.

58.     Volkswagen's diesel engines, like most passenger vehicle and SUV engines, include engine control units ("ECUs") that process numerous data inputs and coordinate and control a host of engine and emissions parameters.  ECUs are essentially computers, i.e., the "brains" of the vehicle, and they are programmed with software code and process that code while in operation in response to data signals and sensor inputs to set engine conditions and govern emissions control operations.

59.     According to Volkswagen, it was not able to produce an EA 189 engine that had the desired fuel economy and performance—which also met the applicable emissions standards—within the budget and timeframe set out by Volkswagen for introduction of the EA 189 engine-group vehicles in the United States.

60.     Rather than adjust internal development timelines or budgets—or even use more established commercially available NOx reduction technologies—Volkswagen decided instead to develop defeat devices to illegally circumvent emissions testing and allow its vehicles to emit excess NOx into the air during everyday operation.

61.     Volkswagen thus created the initial defeat devices at issue in this action in the EA 189 2.0 liter engines using software code, timers, and/or calibrations in the ECU.  Volkswagen programmed the ECU to monitor certain vehicle operation conditions so that the ECU could recognize when a vehicle was undergoing an emissions test, which are typically performed by CARB or EPA.  When the ECU determined that a vehicle was undergoing an emissions test, it would alter the engine's performance to reduce NOx production by fully engaging the vehicle's NOx reduction technologies, thus temporarily (for the known duration of the test cycle) bringing emissions within CARB's and EPA's standards.  However, this came at a cost in terms of fuel economy, because some of the emissions controls used fuel to fully engage the treatment technology.

62.     When the ECU determined that the vehicle was not undergoing emissions testing, however, the engine would operate in a different manner, circumventing or significantly reducing use of emissions control strategies and substantially increasing NOx emissions.  Put simply, it was designed by Volkswagen to reduce or shut off the treatment system when the vehicle was driven in real-world conditions, thus significantly emitting NOx at many times the California and EPA limits.

63.     In the years after first implementing a defeat device in its EA 189 engine, Volkswagen refined and "improved" its defeat devices and related software and developed new ways to circumvent emissions testing.  For example, in later generations of the 2.0 liter engine, Volkswagen varied the parameters it used to identify and defeat emissions testing protocols.  These included the addition of a 20 degree steering wheel input to determine if the car was being driven on the road or tested on a dynamometer, which would have a fixed steering wheel input of 0 degrees during testing.  Changes were also made in later model years to refine the parameters under which the vehicles would enter the test mode, thus reducing its inadvertent activation during real world driving.

64.     Volkswagen also made improvements to its defeat device strategy over time as emission control technology evolved.  Vehicles equipped with SCR systems were calibrated to dose or inject less DEF during real world driving than when the vehicles were undergoing an official emissions test cycle.  This decrease in DEF dosing resulted in less efficiency in NOx treatment and higher tailpipe NOx emissions.  One of the reasons for this reduced use of DEF during real world driving was to conserve the DEF so that the DEF tank would only need to be refilled at the scheduled 10,000 mile maintenance intervals.  This allowed Volkswagen to design and continue to use an under-sized DEF tank, which is located in or near the trunk, so that Volkswagen could advertise its vehicles as having the best trunk space in their class of vehicles.

65.     Similarly, because Volkswagen continued to rely on defeat devices to meet emissions standards in subsequent generations of its 2.0 liter engines, it was able to change its engine technologies to use cheaper parts, thereby allowing it to save money, increase profits, and better compete with ZEVs and PZEVs offered by other manufacturers.

66.     Volkswagen also employed defeat devices in certain 3.0 liter engines, using software and/or calibrations in the ECU and other mechanisms to detect emissions testing cycles and minimize emissions during testing.  As just one example, the ECU in the 3.0 liter vehicles would put the vehicle into one mode during emissions testing, and return the vehicle to another mode—with accompanying excess NOx emissions—during normal driving conditions.  Among other things, Volkswagen used a variety of parameters and mechanisms to detect when the vehicles were undergoing emissions testing.  Only during testing would the vehicles fully engage NOx emissions reduction technologies.  However, if the vehicle was not undergoing those certification tests, emissions controls were not fully engaged, and emissions increased.

67.     Volkswagen has admitted that it included one or more defeat devices in the 2.0 liter and 3.0 liter diesel vehicles identified below.

## IV.   PORSCHE USED VOLKSWAGEN ENGINES THAT CONTAINED UNDISCLOSED AECDs AND/OR DEFEAT DEVICES IN ITS DIESEL VEHICLES

68.     In its model year 2013 through 2016 Porsche Cayenne diesel vehicles, Porsche used engines and/or other components it acquired from Volkswagen.  These engines contained undisclosed AECDs and/or defeat devices.

## V.   VOLKSWAGEN FAILED TO DISCLOSE ALL OF ITS AECDs SO THAT CARB COULD PROPERLY EVALUATE THEM

69.     On November 19, 2015, Volkswagen admitted to 4 undisclosed AECDs, including some emissions increasing AECDs in its 2.0 liter vehicles.  Since then, Volkswagen has admitted to more than a dozen additional undisclosed AECDs in its 2.0 liter vehicles.

70.     As the existence of an AECD is not readily apparent since it is frequently buried in computer programming language for the ECU, full disclosure to CARB is not only required by the regulations, but is necessary for CARB to fully evaluate the AECD.

**VI.   VOLKSWAGEN FAILED TO DISCLOSE MATERIAL INFORMATION IN ITS APPLICATIONS FOR CERTIFICATION TO IMPORT AND SELL ITS POLLUTING DIESEL VEHICLES IN CALIFORNIA**

71.    The California Health and Safety Code requires new motor vehicles and new motor vehicle engines to be certified by CARB before such new motor vehicles or new motor vehicle engines may be imported, delivered, purchased, rented, leased, acquired, received, offered for sale, sold, or registered in California.

72.    From approximately 2008 through 2015, Volkswagen submitted to CARB annual applications for Executive Orders to allow the sale of certain 2.0 and 3.0 liter diesel-engine vehicles, which vehicles include illegal defeat devices and undisclosed AECDs.  These affected vehicles include at least the following models and model years:

  a.    2.0 liter vehicles:

  (i.)    Volkswagen Jetta TDI, 2009-2015;

  (ii.)    Volkswagen Jetta SportWagen TDI, 2009-2014;

  (iii.)    Volkswagen Beetle TDI, 2013-2015;

  (iv.)    Volkswagen Beetle Convertible TDI, 2013-2015;

  (v.)    Audi A3 TDI, 2010-2013, 2015;

  (vi.)    Volkswagen Golf TDI, 2010-2015;

  (vii.)    Volkswagen Golf SportWagen TDI, 2015;

  (viii.)    Volkswagen Passat TDI, 2012-2015.

  b.    3.0 liter vehicles:

  (i.)    Volkswagen Touareg TDI, 2009-2016;

  (ii.)    Audi A6 Quattro TDI, 2014-2016;

  (iii.)    Audi A7 Quattro TDI, 2014-2016;

  (iv.)    Audi A8 TDI, 2014-2016;

  (v.)    Audi A8L TDI, 2014-2016;

  (vi.)    Audi Q5 TDI, 2014-2016;

  (vii.)    Audi Q7 TDI, 2009-2016.

73.     From approximately 2012 through 2016, Porsche submitted to CARB annual applications for Executive Orders to allow the sale of certain 3.0 liter diesel-engine vehicles, which vehicles include illegal defeat devices and/or undisclosed AECDs.  These affected vehicles include at least the following models and model years: Porsche Cayenne Diesel, 2013-2016.

74.     Each of the respective applications for certification for each model year of these vehicles set forth in paragraphs 72 and 73 above contained multiple and material false statements and omissions related to the defeat devices and AECDs, on-board diagnostics, and emissions requirements.

75.     Part of the CARB certification process involves the submission of emissions testing data by the vehicle manufacturer.  The emissions compliance data submitted by Volkswagen and Porsche to CARB in connection with each application for certification contained material misrepresentations, false statements, and/or material omissions, and the emissions testing was not completed according to CARB requirements, because, among other reasons, this data was generated through the use of an undisclosed AECD and/or defeat device and was not representative of the manufactured vehicles' performance under normal operating conditions.

76.     Part of the CARB certification process involves signing a "statement of compliance" with applicable standards for each certification application.  Volkswagen and Porsche knew, or should have known, that their statements of compliance in each of their applications for certification were false or misleading regarding their compliance with state and federal emissions laws and regulations, because, among other reasons, each statement of compliance related to a certification application, which application failed to disclose AECDS and/or defeat devices, on-board diagnostics non-conformities, and emissions standard failures.

77.     Volkswagen's and Porsche's false and misleading statements and omissions to CARB allowed the above-described make and model year vehicles to be certified for sale, lease, or rental in California despite their non-compliance with California law and emission standards.

78.     Relying upon Volkswagen's and Porsche's statements and information as accurate in each of Volkswagen's and Porsche's applications for certification for each of the above-described diesel vehicle models, CARB issued Executive Orders for these vehicles.

79.     As manufactured, the above-described diesel vehicle models did not conform in all material respects with the vehicles descried in Volkswagen's and Porsche's applications for certification, and certified by CARB, because the manufactured Subject Vehicles contained AECDs and/or defeat devices, on-board diagnostics non-conformities, and did not meet emission standards.

80.     Approximately 87,000 Subject Vehicles under the brands Volkswagen, Audi, and Porsche were sold or leased in California between 2008 and 2015 under these improperly obtained Executive Orders, including approximately 71,000 2.0 liter diesel engine vehicles and approximately 16,000 3.0 liter diesel engine vehicles.

81.     As explained further below, Volkswagen's and Porsche's conduct violated multiple California laws and regulations.  These violations include, among others, the following: importing and/or delivering vehicles not certified in compliance with California law; use of illegal and undisclosed AECDs and/or defeat devices; failure to comply with prescribed test procedures; violation of onboard diagnostic systems requirements; emissions warranty violations; mislabeling of vehicle emission control information; invalid fuel economy ratings; and importing, leasing, renting, and selling (or assisting in the sale of) vehicles in California that are not properly certified and violate emission standards.

## VII.   VOLKSWAGEN MISLED CONSUMERS WHEN IT MARKETED ITS DIESEL VEHICLES EQUIPPED WITH DEFEAT DEVICES

82.     In conjunction with its plans to increase its market share and sales of its diesel vehicles in the United States, beginning in 2008, Volkswagen spent millions of dollars engaging in aggressive, widely disseminated, and successful advertising campaigns for its 2.0 and 3.0 liter diesel-engine vehicles conveying the supposed environmental, vehicle performance, and economic advantages of Volkswagen's diesel vehicles.

83.     In some of its advertising campaigns, Volkswagen targeted environmentally conscious consumers who also wanted vehicles that delivered high performance (for example, in terms of power or torque).  Volkswagen deceptively portrayed these diesel vehicles as "clean" and even collaborated with environmental non-profit organizations in efforts to depict the vehicles as sensible alternative fuel vehicles.

84.     Volkswagen's advertising campaigns for its diesel vehicles included television advertisements (including Super Bowl ads), online social media campaigns, press releases, public statements, and product placements.  Volkswagen spent millions of dollars on these advertisements, including targeting California consumers.  These efforts resulted in the sale or lease of approximately 580,000 vehicles equipped with defeat devices nationwide.  Volkswagen sold or leased tens of thousands of vehicles with defeat devices and other undisclosed AECDs in California.  By the fall of 2015, Volkswagen had become the largest seller of light-duty diesel vehicles in the United States.

85.     During its deceptive advertising campaigns, Volkswagen and Porsche made numerous, material misrepresentations and omissions arising out of its use of undisclosed AECDs and/or defeat devices in its diesel vehicles.  Five major categories of misrepresentations and omissions are identified below.

a.     **Volkswagen's Diesel Vehicles Had Low Emissions.**  Volkswagen advertisements, promotional materials, and public statements falsely represented that its diesel vehicles had low emissions.  Such statements included that Volkswagen's clean diesel technology reduced NOx by 90%, resulted in lower NOx than comparable diesel vehicles, had lower emissions than comparable diesel vehicles, and had lower emissions than comparable gasoline vehicles.

b.     **Volkswagen's and Porsche's Diesel Vehicles Complied with State and Federal Emissions Standards.**  Volkswagen's and Porsche's advertisements, promotional materials, and public statements falsely represented that the diesel vehicles complied with state and federal emission standards.  Such representations included, for example, that these vehicles met the strictest emissions standards and were compliant in all 50 states.

25

1        c.        **Volkswagen's Diesel Vehicles Were Environmentally Friendly.**  Volkswagen's

2    advertising campaigns also targeted environmentally conscious and environmentally responsible

3    consumers.  Its advertisements, promotional materials, and public statements represented that its

4    diesel vehicles were environmentally friendly, including statements that these vehicles were

5    equipped with "Clean Diesel" technology, were "environmentally-conscious," "eco-conscious,"

6    or "green," and similar misrepresentations.  Volkswagen touted its responsibilities to the

7    consumer and commitment to the environment and to building environmentally conscious

8    vehicles, including, in various campaigns, highlighting its "Green Car of the Year" awards.

9        d.        **Volkswagen's Diesel Vehicles Would Retain High Resale Values.**

10   Volkswagen's advertisements, promotional materials, and public statements falsely represented

11   that its diesel vehicles were durable, well-engineered vehicles that would retain a high resale

12   value.  The vehicles were touted as a good investment, and Volkswagen represented that most

13   models would typically have a higher resale value than comparable gasoline models.

14   Volkswagen trained its dealers to emphasize the durability and high resale value of these vehicles.

15       e.        **Volkswagen's Diesel Vehicles Would Provide Better Fuel Economy Than**

16   **Displayed on the Monroney Fuel Economy Label.**  Volkswagen's advertisements, promotional

17   materials, and public statements represented that the diesel vehicles had better fuel economy than

18   the EPA-rated fuel economy displayed on the Monroney Label.  Volkswagen represented that

19   these vehicles would perform significantly over their EPA numbers in the city and on the

20   highway.  Volkswagen also represented that these vehicles performed better in real world fuel

21   economy than its competitors.  These representations were misleading because Volkswagen failed

22   to disclose that the cars only delivered these enhanced levels of fuel economy because the

23   vehicles had defeat devices and employed limited (or non-existent) emissions controls during real

24   world driving.

25       86.        At the time Volkswagen and Porsche made these statements and omissions, they

26   knew, or should have known, that their representations were false and misleading because the

27   diesel vehicles were equipped with defeat devices and/or undisclosed AECDs and did not

28   perform as described.  In fact, the diesel vehicles did not have low emissions, did not comply

26

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

1   with federal and state emissions standards, were not environmentally friendly or "clean," did not

2   retain a high resale value, and only had better fuel economy because the defeat device reduced

3   the effectiveness of the emission control system under normal vehicle operation.

4        87.    Volkswagen and Porsche imported and sold tens of thousands of vehicles with

5   undisclosed AECDs and/or defeat devices to Volkswagen, Audi, and Porsche brand dealers in

6   California, which vehicles were subsequently leased or sold to California consumers.

7        88.    VWGofA, in conjunction with VWAG, and either directly or through its wholly-

8   owned subsidiaries, also provided financing and other monetary support to Volkswagen and

9   Audi brand dealers in California, including dealer inventory financing and incentives.

10        89.    VWGofA, in conjunction with VWAG, and either directly or through its wholly-

11   owned subsidiaries, also developed consumer financial products, such as auto loans and leases.

12   These consumer financial products were heavily marketed, along with Volkswagen and Audi

13   brand vehicles, to assist in the sale or lease of the vehicles, including Volkswagen's falsely

14   named "TDI Clean Diesels."

15        a.    VWGofA, either directly or through its wholly-owned subsidiaries, and with

16   assistance from additional Volkswagen-related entities, developed and advertised specific, special

17   consumer finance products marketed or associated with "clean diesels."  These advertisements

18   contained powerful combined deceptive messages directed to consumers concerning "German

19   precision" diesel engines, "TDI Clean Diesels," 46 miles per gallon and extended range, and zero-

20   percent financing and cash back bonuses.

21        b.    VWGofA also required dealerships, for at least some of the relevant time period,

22   to bring on specific employees, whose hire was subject to approval by VWGofA (or its wholly-

23   owned subsidiaries), to specifically market consumer financial products at the dealership,

24   including financial products in conjunction with the lease or purchase of "TDI Clean Diesels"

25   with defeat devices.

26        c.    These consumer financial products were among Volkswagen's most significant

27   profit centers related to "TDI Clean Diesels."  These consumer financial products were an integral

28   part of Volkswagen's overall plan to monetize and profit from the Subject Vehicles, all of which

1     included undisclosed AECDs and defeat devices, and these special offers and cash bonuses were

2     heavily marketed along with the false environmental messages and other false claims to facilitate

3     the sale of the Subject Vehicles.

4           90.     VWGofA, either directly or through its wholly-owned subsidiaries, marketed and

5     sold tens of thousands of loan or lease products for the Subject Vehicles in California.

6     **VIII. VOLKSWAGEN CONCEALED ITS WRONGFUL CONDUCT BUT WAS EVENTUALLY**

7             **FORCED TO ADMIT ITS USE OF DEFEAT DEVICES**

8           91.     In addition to its new vehicle certification process, CARB regularly tests

9     automobiles to ensure their emissions performance is as expected throughout their useful life,

10     and performs investigative testing if warranted.

11           92.     In 2012, CARB initiated a testing campaign at its Haagen-Smit Laboratory

12     focused on light-duty diesel vehicles, and also agreed to provide in-kind support to the

13     International Council on Clean Transportation (ICCT) in its studies of light-duty diesel vehicles.

14     In 2014, the ICCT and West Virginia University (WVU) identified through their test program,

15     and brought to CARB's attention, concerns of elevated NOx emissions during real world driving

16     of certain Volkswagen diesel vehicles.

17           93.     The vehicles tested by ICCT/WVU included vehicles with Generation 1 and

18     Generation 2 2.0 L engines. In real world testing, these vehicles were found to exceed emissions

19     standards by a factor of up to 40.  These same vehicles, however, passed standardized and

20     published emissions testing procedures on a dynamometer at CARB's testing facility in El

21     Monte, California.

22           94.     This prompted CARB to start an investigation and discussions with Volkswagen.

23     CARB questioned Volkswagen concerning the high NOx emissions that ICCT/WCU observed

24     on Volkswagen's 2.0 liter diesel vehicles during real world driving.  CARB also began to test

25     NOx emissions from these vehicles during real world driving.

26           95.     After CARB brought the ICCT/WCU testing results to Volkswagen's attention,

27     Volkswagen initiated test protocols to replicate the ICCT/WVU experiments, purportedly to help

28     CARB identify technical reasons for the "unexpected" high on-road emissions.  Throughout

28

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

these discussions between Volkswagen and CARB and during the time period between the ICCT/WVU report and Volkswagen's ultimate admission in September 2015, Volkswagen withheld, omitted, and misrepresented facts in order to conceal the presence and impact of the defeat devices.  Volkswagen presented a series of shifting false or misleading technical "explanations" for the high on-road emissions to CARB, but never disclosed that defeat devices were the real cause of the high NOx emissions.

96.     In 2014 and 2015, during several in-person and telephonic conversations and presentations between CARB and Volkswagen, Volkswagen made material misrepresentations to, and omitted material information from, CARB and failed and refused to disclose the existence of the defeat devices.

97.     CARB expended significant time and resources in its investigation of high NOx emissions observed from Volkswagen's 2.0 liter diesel-engine vehicles and deployed new test methods to detect these defeat devices.

98.     Volkswagen repeatedly concealed the existence of the defeat devices.  Rather than admit to the use of defeat devices, Volkswagen suggested a number of potential technical issues and in-use conditions that might explain the high NOx emissions.  Volkswagen took advantage of CARB's reliance on Volkswagen's representations that it was working with CARB in good-faith to find engineering explanations for (and proposed ways to address) the emissions anomalies.

99.     Volkswagen encouraged and supported numerous expensive and lengthy laboratory and on-road tests by CARB, as Volkswagen purported to be confused by CARB's testing results and Volkswagen assured CARB that a solution to, or explanation for, the anomalous testing results could be found.

100.     Volkswagen proposed and implemented a recalibration through a software recall for the Generation 1 and Generation 2 vehicles beginning in December 2014.  The recall affected all 2009 to 2014 model-year 2.0 liter diesel vehicles equipped with Generation 1 and Generation 2 technology, and Volkswagen claimed that the recall would address, among other things, the increased real world driving excess NOx issue.

1    101.    Volkswagen commenced the voluntary recalls even though it knew of the

2    existence of the defeat devices and undisclosed AECDs, and that the proposed modifications

3    would not remove the defeat device and/or would not resolve the real-world driving excess NOx

4    issue.

5    102.    CARB continued to expend significant time and resources in its investigation of

6    high NOx emissions observed from Volkswagen's 2.0 liter diesel-engine vehicles under real

7    world driving conditions, as well as in connection with Volkswagen's proposed recalibration and

8    recall.

9    103.    The recalibration did not, and could not, address the real underlying issue of the

10   undisclosed defeat devices.  In addition, the software recalibration did not, and could not, result

11   in compliance with emissions standards.  The recall ultimately was deemed ineffective.

12   104.    Volkswagen continued to have technical meetings with CARB staff to discuss the

13   high NOx emissions.  Volkswagen continued to suggest a number of potential technical issues

14   and in-use conditions that might explain the higher emission test results.  Volkswagen did not

15   disclose that these vehicles were designed and manufactured with defeat devices to bypass,

16   defeat, or render inoperative elements of the vehicles' emission control system, and CARB staff

17   continued their diligent investigation.

18   105.    Volkswagen continued selling, offering, leasing, renting, and delivering new

19   vehicles that did not meet the emission standards and that employed defeat devices and

20   undisclosed AECDs.

21   106.    On or about September 3, 2015, following persistent CARB inquiry, Volkswagen

22   finally admitted that its 2.0 liter diesel vehicles included defeat devices that circumvent

23   California's emissions testing and regulations, and that the defeat devices were neither described

24   nor justified in the certification applications submitted by Volkswagen to CARB from 2008

25   through 2015.

26   107.    The defeat devices in Volkswagen's 2.0 liter diesel vehicles have caused

27   substantial excess and illegal emissions of NOx from these vehicles.  The excess emissions from

28   these vehicles are ongoing.  Volkswagen has not brought the vehicles into compliance with

30

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

California or federal emission standards or mitigated past, current, or future harm to the environment.  As described above, CARB provided Volkswagen with numerous opportunities since 2014 to discuss the causes of the excess NOx emissions, in the hopes that a resolution could be reached.  Volkswagen, however, continued to provide misleading statements and omissions during this time, all of which perpetuated the additional excess emissions.

108.    On September 18, 2015, CARB sent Volkswagen an in-use compliance letter for the 2.0 liter diesel vehicles "to determine the appropriate corrective action to rectify the emission non-compliance and return of these vehicles to the claimed certified configuration."

109.    On October 8, 2015, Michael Horn, President and CEO of Volkswagen Group of America, Inc., admitted in sworn testimony to the United States Congress "that emissions software in four cylinder diesel vehicles from model years 2009-2015 contained a 'defeat device' in the form of hidden software that could recognize whether a vehicle was being operated in a test laboratory or on the road. The software made those vehicles emit higher levels of [NOx] when the vehicles were driven in actual road use than during laboratory testing."

110.    Following the discovery of the defeat devices in Volkswagen's 2.0 liter vehicles, CARB notified all vehicle manufacturers of its intent to perform additional testing of other vehicles to identify any defeat devices.  CARB and other government agencies performed additional emissions testing that confirmed the presence of defeat devices in certain Volkswagen and Porsche 3.0 liter diesel vehicles.  Volkswagen initially denied the existence of defeat devices in 3.0 liter vehicles.

111.    In November 2015, following continued pressure by CARB, Volkswagen admitted that certain 3.0 liter diesel vehicles for model years 2009-2016, including Audi and Porsche vehicles, contain defeat devices and/or undisclosed AECDs that circumvent California's emissions regulations and testing.

112.    On November 20, 2015, Volkswagen submitted a proposed recall plan to address the 2.0 liter diesel vehicles.

113.     On November 25, 2015, CARB sent Volkswagen an in-use compliance letter, requiring a recall plan for the 3.0 liter diesel vehicles "to take appropriate corrective action to remedy the nonconformity and return these vehicles to claimed certified configurations…"

114.     On January 12, 2016, CARB denied Volkswagen's proposed recall plan to address the 2.0 liter vehicles because it, among other things, failed to: (1) adequately describe the nonconformities; (2) adequately describe the remedial procedure; (3) adequately describe the impact of the repairs on fuel economy, drivability, performance, safety, and emissions; (4) demonstrate how the modifications are designed to correct the nonconformities; (5) provide onboard diagnostic system data; and (6) provide sufficient detail for CARB to evaluate the feasibility and success of the proposed plan.  Simultaneously, CARB issued a Notice of Violation to Volkswagen relating to the 2.0 liter diesel vehicles for, among other things, importing and selling uncertified vehicles, providing an invalid emission control information label, including an invalid smog rating on the Smog Index Label, violating emission warranty provisions, and failing to completely describe all of the defeat devices and AECDs, comply with emissions standards or test procedures, and comply with onboard diagnostic system requirements.

115.     On February 2, 2016, CARB received proposed emissions recall plans from Volkswagen and Porsche for their 3.0 liter diesel vehicles.  These proposed emissions recall plans are inadequate and are not approvable because these plans fail to, among other things, completely describe all of the defeat devices and AECDs and fail to demonstrate that these vehicles will be returned to the claimed certified configurations.

116.     CARB has continued to investigate whether Volkswagen has employed other defeat devices in the Subject Vehicles.  As late as June 9, 2016, Volkswagen admitted to an additional defeat device in its 3.0 liter vehicles, which was discovered by CARB during its investigation.

IX.   **VOLKSWAGEN'S EXCESS POLLUTION HARMS THE ENVIRONMENT AND PUBLIC HEALTH**

117.   Volkswagen's 2.0 liter vehicles equipped with defeat devices have resulted and continue to result in increased NOx emissions by a factor of up to 40 times the CARB-compliant levels, depending on vehicle type, vehicle loads, and driving conditions (e.g., city or highway).

118.   Volkswagen's 3.0 liter vehicles equipped with defeat devices have resulted and continue to result in increased NOx emissions by a factor of up to 25 times the CARB-compliant levels, depending on vehicle type, vehicle loads, and driving conditions (e.g., city or highway).

119.   The excess NOx emissions from Volkswagen's 2.0 and 3.0 liter vehicles and Porsche's 3.0 liter vehicles equipped with undisclosed AECDs and/or defeat devices have caused and are causing significant damage to the State of California, including to the health of its residents and its natural resources.

120.   The primary excess pollutant emitted from the Subject Vehicles, NOx, is a highly reactive gas that is a major contributor to two other air pollutants, particulate matter and ozone. NOx emissions, and the particulate matter and ozone pollution to which NOx contributes, are among the most regulated air pollutants in the US and California due to the large impacts these pollutants have on public health and the environment.

121.   Particulate matter has scientifically demonstrated negative effects on public health and welfare.  A strong and broad body of evidence links inhalation of particulate matter pollution with premature death, respiratory illnesses, and heart disease.  In the short term, NOx and particulate matter have been found by scientific studies in California and elsewhere to reduce lung function and exacerbate the symptoms of asthmatics.  Long term, chronic conditions such as reduced lung function, asthma, and chronic obstructive pulmonary disease are among the many adverse effects of these air pollutants.  Particulate matter can also impair visibility and damage vegetation.

122.   Ozone is the prime ingredient to smog.  EPA analyses have found that short term exposure to ozone "induced (or [was] associated with) statistically significant declines in lung function."  Such short term exposure results in increases in asthma medication use in children,

33

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

1    emergency room visits, and hospital admissions for respiratory conditions, and is a likely cause

2    of a range of other health and mortality issues.

3        123.    An EPA analysis of ozone in 2013 found that "strong evidence" exists that ozone

4    concentrations impair many native plants and trees by injuring foliage, decreasing growth and

5    biomass accumulation in annual, perennial, and woody plants (including agronomic crops,

6    annuals, shrubs, grasses, and trees), and decreasing the yield and/or nutritive quality in a large

7    number of agronomic and forage crops.

8    **X.    VOLKSWAGEN'S FALSE STATEMENTS AND OMISSIONS WASTED GOVERNMENT
         RESOURCES.**

9

10       124.    From 2014 to the present, Volkswagen's false statements to CARB have wasted

11   significant government resources.  CARB devoted thousands of person-hours by highly trained

12   scientists, automotive engineers, and other professionals in an attempt to work with Volkswagen

13   to determine an honest scientific or engineering explanation for the emissions anomalies in the

14   ICCT/WVU testing data.  CARB conducted certification tests, subsequent tests designed to

15   ferret out defeat devices, and conducted other tests to uncover details on the defeat devices and

16   undisclosed AECDs in Volkswagen's diesel vehicles.

17       125.    Volkswagen engaged in nearly 20 meetings, as well as numerous conference calls,

18   videoconferences, and other communications, with CARB personnel between January 2014 and

19   September 2015.  During these communications, Volkswagen assured CARB personnel that an

20   honest scientific or engineering solution could be found.  Volkswagen made numerous

21   increasingly detailed formal presentations, which were ultimately contradictory.

22       126.    Conservatively estimated, Volkswagen submitted thousands of pages of false or

23   misleading documents concerning its applications for Executive Orders concerning the Subject

24   Vehicles, and thousands of pages of false or misleading documents in support of its efforts to

25   assist CARB in determining a purportedly "innocent" explanation for the data discrepancies in

26   the ICCT/WVU study, rather than admit the presence of defeat devices.

27

28

## FIRST CAUSE OF ACTION
### (Consumer Financial Protection Act of 2010, 12 U.S.C. § 5536, et seq.)
### [By CAAG on Behalf of the People of the State of California Against Volkswagen]

127.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

128.    Section 1036(a)(1)(B) of the CFPA, 12 U.S.C. § 5536(a)(1)(B), makes it unlawful for a covered person to, among other things, engage in  any deceptive act or practice.

129.    At all relevant times, VWGofA and/or other Volkswagen Defendants (either directly or through affiliated entities) have offered "consumer financial products or services" to "consumers," 12 U.S.C. § 5481(4)-(5), because they have offered consumer financial products to consumers for the purchase or lease of automobiles.

130.    At all relevant times, the Volkswagen Defendants have been "persons" under 12 U.S.C. § 5481(19).

131.    At all relevant times, the Volkswagen Defendants have been "affiliates" by and of one another under 12 U.S.C. § 5481(1).

132.    At all relevant times, the Volkswagen Defendants have been controlling shareholders of wholly-owned subsidiaries that have directly marketed and sold consumer financial products or services in connection with the lease and purchase of the Subject Vehicles. Under 12 U.S.C. § 5481(25), the Volkswagen Defendants are "related persons" of their wholly-owned subsidiaries who marketed or sold consumer financial products or services, and are thus deemed to be "covered persons."

133.    At all relevant times, the Volkswagen Defendants have been "service providers" under 12 U.S.C. § 5481(26) because they have provided material service to a covered person, either by taking part in designing, operating, or maintaining consumer financial products or services, such as vehicle purchase loans or leases, or through processing transactions relating to the sale of the consumer financial products or services.

134.    At all relevant times, the Volkswagen Defendants have been "covered persons" under 12 U.S.C. § 5481(6) because: (1) they are persons that have either engaged in offering or providing consumer financial products or services; (2) they have acted as affiliates of one

35

another as "service providers"; or (3) they are "related persons" of wholly-owned subsidiaries that have engaged in offering or providing consumer financial products or services and thus are deemed to be "covered persons."

135.    The Volkswagen Defendants have further agreed together to provide consumer financial products as part of their conspiracy to market and sell or lease unlawful vehicles, or to aid and abet such sales or leases, because available, convenient access to consumer financial products on favorable terms, including discounts, promotional rates, and bonuses, helps to facilitate the sale of automobiles, and the sale of consumer financial products was a necessary and profitable component of the overall scheme to market and sell the Subject Vehicles.

136.    As described above, the Volkswagen Defendants knew or should have known that the Subject Vehicles that they were marketing for sale or lease to consumers did not have the qualities that they were represented to have, including that they contained defeat devices and were not in compliance with California and federal emissions requirements.

137.    The Volkswagen Defendants marketed automobile loans and leases to consumers to facilitate sales and to generate additional profits from their unlawful activities.  These advertisements included, for example, Volkswagen's "Sign and Drive" promotions, which were widely disseminated in print and on television.

138.    None of the Volkswagen Defendants' consumer financial product marketing or advertising materials disclosed that the Subject Vehicles contained defeat devices and that they did not have the qualities they were represented to have, including that they were not in compliance with California and federal emissions requirements, and could not be lawfully sold in California or the United States with such defeat devices.

139.    None of the Volkswagen Defendants' disclosures provided with its consumer financial products disclosed that the Subject Vehicles contained defeat devices and that they did not have the qualities they were represented to have, including that they were not in compliance with California and federal emissions requirements.

140.    The Volkswagen Defendants' offering or providing of consumer financial products in connection with the sale or lease of Volkswagen and Audi brand vehicles containing defeat

devices, with no disclosures that the vehicles contained defeat devices and did not have the qualities they were represented to have, including that they were not in compliance with California and federal emissions requirements, was a deceptive "act or practice under Federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." 12 U.S.C. § 5531(a). Each Volkswagen Defendant could not have offered or provided these consumer financial products for the Subject Vehicles without other Volkswagen Defendants' roles as "service providers" related to the sale of the consumer financial products.

141.    The Volkswagen Defendants violated 12 U.S.C. § 5536(a)(1)(B)'s prohibition on "deceptive" acts or practices. It was a "deceptive" act or practice for the Volkswagen Defendants to offer or provide consumer financial products in connection with the purchase or lease of the affected vehicles without disclosing the presence of the defeat device, which makes the sale of the vehicle unlawful. The offering or providing of consumer financial products in connection with the attempted sale or lease of the affected vehicles thus misled, or would be likely to mislead, consumers as to the true qualities of the affected vehicles, including that the vehicle was not in compliance with California and federal emissions requirements.

**SECOND CAUSE OF ACTION**
**(Health & Saf. Code § 43151)**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

142.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

143.    California Health & Safety Code § 43151 is a strict liability statute, stating that no person who is a resident of, or who operates an established place of business within, California shall import, deliver, purchase, rent, lease, acquire, or receive a new motor vehicle for use, registration, or resale in California unless such motor vehicle has been certified pursuant to applicable law, and no person shall attempt or assist in any such action.

144.    Volkswagen operates numerous places of business in California, including without limitation an Electronics Research Laboratory in Silicon Valley, a regional sales office in

37

Woodland Hills, and the Test Center California ("TCC") in Oxnard.  TCC is the largest technical

center of its kind for Volkswagen outside of Germany.  According to VWAG, TCC is the only

North American research and development center for Volkswagen, Audi, and Porsche, and it is

focused on powertrain and systems development, governmental compliance, and field quality

testing.  According to VWAG, TCC is a state-of-the-art development center that features an

emissions test laboratory, parts analysis capabilities, a vehicle workshop with more than 16 in-

ground lifts, and a dealer service and training center.

145.    Volkswagen and Porsche imported and/or delivered the new motor vehicles

identified in paragraphs 72 and 73 for intended use, registration, or resale in California, and/or

attempted or assisted in such actions.  Volkswagen's and Porsche's new motor vehicles, as

manufactured, are not certified in compliance with California law because they do not conform

in all material respects to the design specifications described in the applications for certification

that purportedly cover them, including that they (i) contain AECDs that were not disclosed in the

applications, (ii) contain defeat devices, and/or (iii) do not contain an on-board diagnostics

system capable of detecting and warning a driver of excess NOx emissions.  Further,

Volkswagen did not test the appropriate durability data vehicle and/or the appropriate emissions

data vehicle.

146.    Volkswagen's and Porsche's actions constitute multiple violations of Health &

Safety Code § 43151.

### THIRD CAUSE OF ACTION
**(Health & Saf. Code § 43152)**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

147.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set

forth here in full.

148.    California Health and Safety Code § 43152 provides that no person engaged in the

business of selling to an ultimate purchaser or renting or leasing new motor vehicles, including

manufacturers, distributors, and dealers, shall intentionally or negligently import, deliver,

purchase, receive, or otherwise acquire new motor vehicles intended for use primarily in

38

California for sale or resale to an ultimate purchaser who is a resident of or doing business in California, or for registration, leasing, or rental in California, which has not been certified pursuant to this chapter; and no person shall attempt or assist in any such action.

149.    Volkswagen and Porsche engaged, as a manufacturer or distributor, in the business of selling to an ultimate purchaser or leasing new motor vehicles and intentionally or negligently importing and/or delivering the new motor vehicles identified in paragraphs 72 and 73 above that were intended for use primarily in California for sale or resale to an ultimate purchaser who is a resident of or doing business in California, or for registration, leasing, or rental in California, or attempting or assisting in any such actions.  Volkswagen's and Porsche's new motor vehicles, as manufactured, are not certified in compliance with California law because they do not conform in all material respects to the design specifications described in the applications for certification that purportedly cover them, in that they, among other things, (i) contain AECDs that were not disclosed in the applications, (ii) contain defeat devices, and/or (iii) do not contain on-board diagnostics systems capable of detecting and warning drivers of excess NOx emissions. Further, Volkswagen and Porsche did not test the appropriate durability data vehicle and/or did not test the appropriate emissions data vehicle.

150.    Volkswagen's and Porsche's actions constitute multiple violations of Health and Safety Code § 43152.

### FOURTH CAUSE OF ACTION
**(Health & Saf. Code § 43153)**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

151.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full

152.    California Health & Safety Code § 43153 provides that no person engaged in the business of selling to an ultimate purchaser or renting or leasing new motor vehicles, including manufacturers, distributors, and dealers, shall intentionally or negligently sell, or offer to sell, to an ultimate purchaser who is a resident of or doing business in California, or lease, rent, or offer to rent in California, any new motor vehicle which is intended primarily for use or for

1  registration in California and has not been certified pursuant to this chapter; and no person shall

2  attempt or assist in any such action.

3       153.   Volkswagen and Porsche engaged, as a manufacturer or distributor, in the business

4  of selling to an ultimate purchaser or leasing new motor vehicles and intentionally or negligently

5  selling, or offering to sell, to an ultimate purchaser who is a resident of or doing business in

6  California, or leasing, offering to lease, in California the new motor vehicles identified in

7  paragraphs 72 and 73 above, which are not certified in compliance with California requirements,

8  and that were intended primarily for use or for registration in California, or attempted or assisted

9  in any such actions.

10      154.   Volkswagen's and Porsche's new motor vehicles are not certified in compliance

11 with California requirements, because, as manufactured, they do not conform in all material

12 respects to the design specifications described in the applications for certification that

13 purportedly cover them, in that they, among other things, (i) contain AECDs that were not

14 disclosed in the application, (ii) contain defeat devices, and/or (iii) do not contain on-board

15 diagnostics systems capable of detecting and warning drivers of excess NOx emissions.  Further,

16 Volkswagen and Porsche did not test the appropriate durability data vehicle and/or did not test

17 the appropriate emissions data vehicle.

18      155.   Volkswagen's and Porsche's actions constitute multiple violations of Health &

19 Safety Code § 43153.

**FIFTH CAUSE OF ACTION**
**(Health & Saf. Code §§ 43016, 43205; 13 C.C.R. § 2037 [Warranty Requirements])**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

23      156.   Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set

24 forth here in full.

25      157.   California Health and Safety Code § 43205 provides that the manufacturer of each

26 light-duty and medium-duty motor vehicle and motor vehicle engine shall warrant to the ultimate

27 purchaser and each subsequent purchaser that the motor vehicle or motor vehicle engine meets

28 specified requirements, including, as applicable here, that it is designed, built, and equipped so

40

1  as to conform with the applicable emissions standards.  Under 13 C.C.R. § 2037, manufacturers

2  must make certain warranty statements, including that the engines it manufactures are designed,

3  built, and equipped so as to conform with all applicable regulations adopted by CARB; and that

4  the engines are free from defects in materials and workmanship which cause the failure of a

5  warranted part to be identical in all material respects to the part as described in the vehicle or

6  engine manufacturer's application for certification.

7      158.    Volkswagen and Porsche each warranted that each of the new motor vehicles

8  identified in paragraphs 72 and 73 above were designed, built, and equipped so as to conform to

9  the applicable California emissions standards, when in fact, they were not.

10     159.    For each Volkswagen and Porsche Subject Vehicle that was ultimately sold to a

11  dealer or ultimately to a purchaser in California, Volkswagen's and Porsche's actions constitute

12  a violation of Health and Safety Code § 43205 and 13 C.C.R. § 2037.

13     160.    California Health and Safety Code § 43016 provides that any person who violates

14  any provision of Division 26, Part 5 (Health & Saf. Code §§ 43000-44299.91, Vehicular Air

15  Pollution Control), or any order, rule, or regulation of CARB adopted pursuant to Part 5, and for

16  which violation there is not provided in Part 5 any other specific civil penalty or fine, shall be

17  subject to a civil penalty not to exceed $500 per vehicle.  Part 5 does not specify a civil penalty

18  or fine for violations of the warranty requirements set forth in Health and Safety Code § 43205

19  and 13 C.C.R. § 2037.

20
## SIXTH CAUSE OF ACTION
**(Health & Saf. Code § 43211; 13 C.C.R. §§ 1961, 1961.2**
21  **[Sale of Motor Vehicles that Fail To Meet Applicable Emission Standards])**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**
22

23     161.    Plaintiff incorporates and realleges paragraphs 1 through  126, inclusive, as if set

24  forth here in full.

25     162.    California Health and Safety Code § 43211 is a strict liability statute which

26  provides that any manufacturer who sells, attempts to sell, or causes to be offered for sale in this

27  state a new motor vehicle that fails to meet the applicable emission standards shall be subject to

28  a civil penalty of $5,000 for each such action.

163.    13 C.C.R. § 1961 sets forth exhaust emission standards for 2004 through 2019 model passenger cars.  Volkswagen and Porsche vehicles identified in paragraphs 72 and 73 above are subject to these standards.

164.    13 C.C.R. § 1961.2 sets forth exhaust emission standards for 2015 and subsequent model passenger cars.  Volkswagen and Porsche vehicles identified in paragraphs and 72 and 73 above are subject to these standards.

165.    As alleged in detail above, Volkswagen and Porsche have sold, attempted to sell, and caused to be offered for sale in California approximately 87,000 Subject Vehicles, over a period of years, that fail to meet the applicable emission standards.

166.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43211.

### SEVENTH CAUSE OF ACTION
**(Health & Saf. Code § 43212; 13 C.C.R. §§ 1961, 1961.2**
**[Failure To Comply with Applicable Emission Standards or Test Procedures])**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

167.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

168.    California Health and Safety Code § 43212 is a strict liability statute which provides that any manufacturer who does not comply with the emission standards or the test procedures adopted by CARB shall be subject to a civil penalty of $50 for each vehicle.

169.    13 C.C.R. § 1961 sets forth emission standards and test procedures for determining compliance with those emission standards for model years 2004 through 2019.  13 C.C.R. § 1961.2 sets forth emission standards and test procedures for model years 2015 and later. Those regulations incorporate by reference 40 C.F.R §§ 86.1801-01 to 86.1871-12, in all relevant respects.

***Non-compliance with Smog Label Requirements***

170.    13 C.C.R. § 1961 requires certain emission control labels as part of the California certification procedures.  In particular, 13 C.C.R. § 1961(d) requires that all certified new passenger cars bear a label reflecting the "smog index."  For model year 2008 through model

42

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

year 2009 vehicles, 13 C.C.R. § 1961(d), which incorporates by reference the 2001-2014 Test Procedures, requires smog index labeling to conform with the requirements in the "California Smog Index Label Specifications for 2004 through 2009 Model Year Passenger Cars and Light-Duty Trucks" ("2004-2009 Smog Label Specifications"). The 2004-2009 Smog Label Specifications prohibit the sale of any model year 2004-2009 vehicles with an incorrect smog index label. A vehicle's smog index or smog score is intended to reflect the relative level of emissions of smog-forming pollutants from that vehicle. The 2001-2014 Test Procedures require a statement indicating that the vehicle conforms to applicable California regulations. However, placement of such a statement on vehicles that, in fact, do not comply with all applicable California regulations, is prohibited.

171. Volkswagen reported smog indices or smog scores for the vehicles identified in paragraph 72 above that did not accurately reflect the level of emissions of smog-forming pollutants from those vehicles. Instead, the operation of the defeat devices resulted in emissions in excess of the levels associated with the reported smog indices or smog scores.

***Non-compliance with AECD Disclosure Requirements***

172. 40 C.F.R § 86.1844-01 (incorporated by reference into 13 C.C.R. §§ 1961 and 1961.2) requires that all applications for certification include a list of all AECDs, and specific information about such AECDs including, but not limited to, a detailed justification for each AECD that results in a reduction in effectiveness of the emission control system and a rationale for why it is not a defeat device.

173. Volkswagen and Porsche each violated 40 C.F.R § 86.1844-01, and CARB's regulations and test procedures at 13 C.C.R. §§ 1961(d) and § 1961.2(d), by failing to include with their applications for certification with regard to the vehicles identified in paragraphs 72 and 73 above a list of all AECDs installed on the Subject Vehicles.

***Use of Prohibited Defeat Devices***

174. 40 C.F.R §§ 86.1809-01, 86.1809-10, 86.1809-12 (incorporated by reference into 13 C.C.R. §§ 1961 and 1961.2) provide that no new light-duty vehicle shall be equipped with a defeat device.

175.     Each of the vehicles identified in paragraph 72 above is a "light duty vehicle," defined at 40 C.F.R. § 86.1303-01 as a passenger car or passenger car derivative capable of seating 12 passengers or less.

176.     Volkswagen violated 40 C.F.R §§ 86.1809-01, 86.1809-10, 86.1809-12, and CARB's regulations and test procedures at 13 C.C.R. §§ 1961(d) and § 1961.2(d), by equipping the vehicles identified in paragraph 72 above with defeat devices.

***Unreliable Test Data***

177.     Volkswagen's and Porsche's actions constitute multiple instances of non-compliance with the emissions standards and test procedures incorporated by reference in 13 C.C.R. §§ 1961 and 1961.2 because Volkswagen and Porsche did not comply with the Smog Label requirements, failed to disclose all AECDs, and used undisclosed AECDs or prohibited defeat devices in their vehicles.

**EIGHTH CAUSE OF ACTION**
**(Health & Saf. Code § 43016, 13 C.C.R. § 1965**
**[Violation of Emission Control, Smog Index,**
**and Environmental Performance Label Requirements])**
**[By CARB on Behalf of the People of the State of California Against All Defendants]**

178.     Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

179.     13 C.C.R. § 1965 (Emission Control, Smog Index, and Environmental Performance Labels) sets forth requirements regarding emission control labels.

***Smog Index Labeling Requirements, Model Years 2009-2015***

180.     13 C.C.R. § 1965 requires certain emission control labels as part of the California certification procedures.  In particular, all certified new passenger cars must bear a label reflecting the "smog index."  For model years 2009 through 2015 vehicles, 13 C.C.R. § 1965 requires smog index labeling to conform with the requirements in the "California Environmental Performance Label Specifications for 2009 and Subsequent Model Year Passenger Cars, Light-Duty Trucks, and Medium-Duty Passenger Vehicles" ("2009 Smog Label Specifications").  The 2009 Smog Label Specifications prohibit the sale of any model year 2009 and subsequent model year vehicles with an incorrect smog index label.

181.    Volkswagen reported smog indices or smog scores for the vehicles identified in paragraph 72 above that did not accurately reflect the level of emissions of smog-forming pollutants from those vehicles.  Instead, the operation of the defeat devices resulted in emissions in excess of the levels associated with the reported smog indices or smog scores.

*Violation of Emission Labeling Requirements*

182.    13 C.C.R. § 1965 requires certain emission control labels as part of the California certification procedures.

183.    For model year 2001 through model year 2014 vehicles, 13 C.C.R. § 1965 requires emission control labels as specified in the 2001-2014 Test Procedures.  The 2001-2014 Test Procedures require a statement indicating that the vehicle conforms to applicable California regulations. However, placement of such a statement on vehicles which, in fact, do not comply with all applicable California regulations is prohibited.

184.    Volkswagen reported that their model year 2008-2014 vehicles conformed to applicable California regulations.  The vehicles did not in fact conform to the regulations as outlined above.

185.    Porsche reported that their model year 2013-2014 vehicles conformed to applicable California regulations.  The vehicles did not in fact conform to the regulations as outlined above.

186.    For model year 2015 vehicles, 13 C.C.R. § 1965 requires emission control labels as specified in the 2015 Test Procedures and Subsequent Model Years. The 2015 Test Procedures require a statement indicating that the vehicle conforms to applicable California regulations. However, placement of such a statement on vehicles which, in fact, do not comply with all applicable California regulations is prohibited.

187.    Volkswagen reported that their model year 2015 vehicles conformed to applicable California regulations.  The vehicles did not in fact conform to the regulations as outlined above.

188.    Porsche reported that their model year 2015-2016 vehicles conformed to applicable California regulations.  The vehicles did not in fact conform to the regulations as outlined above.

*Violation of Durability Demonstration Requirements*

189.    13 C.C.R. § 1965, which incorporates the 2001-2014 Test Procedures and the 2015 Test Procedures, require manufacturers to conduct a durability demonstration for each durability group (40 C.F.R. § 86.1823-08).  One durability demonstration is required for each durability group, and the configuration of the durability data vehicle is determined according to the provisions of 40 C.F.R. § 86.1822–01 (40 C.F.R. § 86.1829-01(a)).  Section 86.1822-01 requires the manufacturer to select the durability data vehicle configuration that is expected to generate the highest level of exhaust emission deterioration as the durability data vehicle for each durability group.

190.    Volkswagen and Porsche selected the durability data vehicle configurations (which included defeat devices and/or other undisclosed AECDs), and which were not "expected to generate the highest level of exhaust emission deterioration," and in fact were selected to ensure that the vehicles would pass testing.

*Violation of Exhaust Emissions Testing Requirements*

191.    13 C.C.R. § 1965, which incorporates the 2001-2014 Test Procedures, require manufacturers to conduct exhaust emissions testing for each test group (40 C.F.R. § 86.1829-15(b)).  Within each test group, the manufacturer must select the emissions data vehicle configuration which is expected to be worst-case for exhaust emission compliance on candidate in-use vehicles (40 C.F.R. § 86.1828-01(a)).

192.    Volkswagen and Porsche selected the emissions data vehicle configurations (which included defeat devices and/or other undisclosed AECDs), and which were not "expected to be worst-case for exhaust emission compliance on candidate in-use vehicles," and in fact were selected to ensure that the vehicles would pass testing.

193.    California Health and Safety Code § 43016 is a strict liability statute which provides that any person who violates any provision of Division 26, Part 5 (Health & Saf. Code §§ 43000-44299.91, Vehicular Air Pollution Control), or any order, rule, or regulation of CARB adopted pursuant to Part 5, and for which violation there is not provided in Part 5 any other specific civil penalty or fine, shall be subject to a civil penalty not to exceed $500 per vehicle.

46

COMPLAINT – PEOPLE OF THE STATE OF CALIFORNIA v. VOLKSWAGEN AG, ET AL.

1   Part 5 does not specify a civil penalty or fine for violations of the warranty requirements set forth

2   in Health and Safety Code § 43205 and 13 C.C.R. § 1965.

3       194.    As alleged in detail above, Volkswagen's and Porsche's actions constitute multiple

4   violations of Health & Safety Code § 43016 and the requirements set forth in 13 C.C.R. § 1965.

5                              **NINTH CAUSE OF ACTION**
                        **(Health & Saf. Code § 43016, 13 C.C.R. § 1903**
6                       **[Violation of Plan-Submission Requirements])**
                **[By CARB on Behalf of the People of the State of California Against All Defendants]**
7

8       195.    Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set

9   forth here in full.

10      196.    13 C.C.R. § 1903 (Plans Submitted) requires any person seeking approval,

11  accreditation, or certification by CARB for any device to control emissions from motor vehicles

12  to submit plans accompanied by reliable test data indicating compliance with the appropriate

13  emissions standards and test procedures adopted by CARB.

14      197.    Volkswagen and Porsche submitted test data that were not reliable because the

15  tests, among other things, were conducted on vehicles (i) with defeat devices, (ii) with

16  undisclosed AECDs, (iii) that were not the appropriate durability data vehicle, and/or (iv) that

17  were not the appropriate emissions data vehicle.  Volkswagen's and Porsche's submitted plans

18  and test data did not accurately reflect the level of emissions or compliance with appropriate

19  emissions standards.  At least with regard to Volkswagen, the operation of the undisclosed

20  AECDs and defeat devices in its diesel vehicles resulted in emissions in excess of the levels

21  associated with the appropriate emissions standards and test procedures adopted by CARB.

22      198.    California Health and Safety Code § 43016 provides that any person who violates

23  any provision of Division 26, Part 5 (Health & Saf. Code §§ 43000-44299.91, Vehicular Air

24  Pollution Control), or any order, rule, or regulation of CARB adopted pursuant to Part 5, and for

25  which violation there is not provided in Part 5 any other specific civil penalty or fine, shall be

26  subject to a civil penalty not to exceed $500 per vehicle.  Part 5 does not specify a civil penalty

27  or fine for failure to submit reliable test data set forth in Health and Safety Code § 43205 and 13

28  C.C.R. § 1903.

199.     As alleged in detail above, Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43016 and the requirements set forth in 13 C.C.R. § 1903.

**TENTH CAUSE OF ACTION**
**(Health & Saf. Code § 43016, 13 C.C.R. § 1903**
**[Violation of Plan-Submission Requirements])**
**[By CARB on Behalf of the People of the State of California Against Volkswagen]**

200.     Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

201.     13 C.C.R. § 1903 provides "Any person seeking approval, accreditation, or certification by the State Board for any device to control emissions from motor vehicles shall submit plans thereof to the State Board. Such plans shall be accompanied by reliable test data indicating compliance with the appropriate emission standards and test procedures adopted by the State Board, and with criteria established by the State Board as set forth in this chapter." In the applications for certification of its 2.0 and 3.0 liter diesel vehicles, Volkswagen stated: "The production vehicles represented by the particular engine families will be in all material respects of the same design as those for which vehicle approval is granted," or something similar. CARB's Executive Orders for Volkswagen's 2.0 and 3.0 liter vehicles state:  "Production vehicles shall be in all material respects the same as those for which certification is granted."

202.     Volkswagen's applications for certification indicate that it can adequately determine when the DEF tank is minimally contaminated (e.g., with water or a different fluid). However, Volkswagen's more recent statements indicate that it can only detect if the tank contains pure or almost pure water (i.e., it contains a minimal amount of DEF).

203.     California Health and Safety Code § 43016 provides that any person who violates any provision of Division 26, Part 5 (Health & Saf. Code §§ 43000-44299.91, Vehicular Air Pollution Control), or any order, rule, or regulation of CARB adopted pursuant to Part 5, and for which violation there is not provided in Part 5 any other specific civil penalty or fine, shall be subject to a civil penalty not to exceed $500 per vehicle.  Part 5 does not specify a civil penalty or fine for failure to submit reliable test data set forth in Health and Safety Code § 43205 and 13 C.C.R. § 1903.

1   204.   Volkswagen's actions constitute multiple instances of non-compliance with 13

2   C.C.R. § 1903 because Volkswagen did not provide "reliable test data indicating compliance."

3   In fact, Volkswagen falsely stated that the vehicle can adequately determine when the DEF tank

4   is minimally contaminated, when it actually cannot do so.  In addition, Volkswagen's

5   applications represented that the production vehicles would be, in all material respects, the same

6   as the certified vehicle.  In fact, Volkswagen falsely represented in its applications that the

7   certified vehicle could adequately determine when the DEF tank was minimally contaminated,

8   when, in fact, the production vehicle does not contain that design (i.e., it can only determine

9   when the DEF tank is substantially or almost completely contaminated).

10   205.   Volkswagen's actions constitute multiple violations of Health & Safety Code §

11   43016 and the requirements set forth in 13 C.C.R. § 1903.

12   **ELEVENTH CAUSE OF ACTION**
**(Health & Saf. Code § 43016, 13 C.C.R. § 1968.2**
**[Violation of Malfunction and Diagnostic System Requirements])**
**[By CARB on Behalf of the People of the State of California Against Volkswagen]**

13

14

15   206.   Plaintiff incorporates and realleges paragraphs 1 through 126, inclusive, as if set

16   forth here in full.

17   207.   13 C.C.R. § 1968.2 (Malfunction and Diagnostic System Requirements) requires

18   that model year 2004 and subsequent model year passenger cars certified for sale in California

19   be equipped with onboard diagnostic ("OBD") systems, and provides that such OBD systems

20   shall monitor emissions systems in-use for the actual life of the vehicle, and shall be capable of

21   detecting malfunctions of those emissions systems and illuminating a malfunction indicator light

22   to notify the vehicle operator if and when emissions exceed certain designated levels.

23   208.   Volkswagen violated 13 C.C.R. § 1968.2 with regard to the vehicles identified in

24   paragraph 72 above by virtue of the fact that the OBD systems installed in those vehicles did not

25   effectively monitor the emissions systems.  Due to the operation of the defeat devices, the OBD

26   systems in those vehicles were not capable of detecting and notifying the operators if and when

27   emissions exceeded the designated levels, or if and when critical components failed.

28   209.   California Health and Safety Code § 43016 is a strict liability statute which

49

provides that any person who violates any provision of Division 26, Part 5 (Health & Saf. Code §§ 43000-44299.91, Vehicular Air Pollution Control), or any order, rule, or regulation of CARB adopted pursuant to Part 5, and for which violation there is not provided in Part 5 any other specific civil penalty or fine, shall be subject to a civil penalty not to exceed $500 per vehicle. Part 5 does not specify a civil penalty or fine for violations of the warranty requirements set forth in Health and Safety Code § 43205 and 13 C.C.R. § 1968.2.

210.    As alleged in detail above, Volkswagen's actions constitute multiple violations of Health and Safety Code § 43016 and the requirements in 13 C.C.R. § 1968.2.

### TWELFTH CAUSE OF ACTION
**(Abatement of a Public Nuisance, Cal. Civil Code § 3494)**
**[By CARB and CAAG on Behalf of the People of the State of California Against Volkswagen]**

211.    Plaintiffs incorporates and realleges paragraphs 1 through 126, inclusive, as if set forth here in full.

212.    A "nuisance" is defined in § 3479 of the California Civil Code as "[a]nything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . ."

213.    A "public nuisance" is defined in § 3480 of the California Civil Code as a nuisance "which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

214.    Pursuant to California Code of Civil Procedure § 3494, "a public nuisance may be abated by any public body or officer authorized thereto by law." Courts have recognized that the Attorney General has authority to maintain an action in the name of the People of the State of California to abate a public nuisance.

215.    The manufacture, marketing, and offering for sale or lease or rent, or the sale, lease or renting of vehicles that emit NOx in excess of legal limits threatens public health and safety, the environment, and the People of the State of California, and constitutes a continuing nuisance throughout the State pursuant to California Civil Code §§ 3479 and 3480.

50

216.     Excess NOx, ozone, and particulate matter are present throughout California as a result of Volkswagen's actions, and illegal and harmful excess emissions continue to be emitted into California's environment from the vehicles at issue.

217.     The emission of excess NOx throughout California is injurious to the health of the public so as to substantially and reasonably interfere with the comfortable enjoyment of life and/or property.

218.     The emission of excess NOx throughout California causes significant harm and any alleged social utility is outweighed by the gravity of the harm inflicted.

219.     The emission of excess NOx throughout California constitutes a nuisance pursuant to California Civil Code § 3479.

220.     The emission of excess NOx throughout California affects and/or interferes with an entire community's and/or a considerable number of persons' right to health, safety, peace, comfort, and convenience in the State of California, thereby constituting a public nuisance pursuant to California Civil Code § 3480.

221.     Volkswagen is liable for public nuisance in that Volkswagen created and/or contributed to the creation of and/or assisted in the creation and/or were a substantial contributing factor in the creation of the public nuisance described herein through the conduct described herein, including, but not limited to:

    a.     Manufacturing, marketing, and selling, leasing, and renting of vehicles containing defeat devices that deceived regulators into permitting these vehicles to operate in California without proper emissions controls; and

    b.     Failing to warn regulators and the public of the true nature of each vehicle's emissions.

222.     As a direct and proximate result of Volkswagen's conduct, excess NOx, ozone, and particulate matter are present throughout California, and are continuing to be emitted into the environment.

223.     As a direct and proximate result of Volkswagen's conduct, large numbers of people throughout the State of California have been exposed and/or will continue to be exposed

51

1    to excess NOx, ozone, and particulate matter throughout California, thereby affecting the health,

2    safety, and welfare of each person.

3        224.    Volkswagen's actions are a direct cause of the public nuisance.

4        225.    The threat to the public health and safety and the environment posed by the public

5    nuisance in the State of California will continue unless Volkswagen are ordered to abate, and do

6    abate the nuisance.

7        226.    The People of the State of California are entitled to preliminary and permanent

8    injunctions from this Court requiring Volkswagen to abate the nuisance present in the State of

9    California.

10                            **THIRTEENTH CAUSE OF ACTION**
                  **(Violations of False Advertising Law, Bus. & Prof. Code § 17500)**
11         **[By CAAG on Behalf of the People of the State of California Against Volkswagen]**

12

13       227.    Plaintiff incorporates and realleges paragraphs 1 through 226, inclusive, as if set

14   forth here in full.

15       228.    Volkswagen, and each of them, have engaged in acts or practices that constitute

16   false advertising as defined in California Business and Professions Code § 17500.

17       229.    Beginning at a date unknown to Plaintiff and continuing to the present,

18   Volkswagen, with the intent to induce California consumers to purchase or lease the Subject

19   Vehicles, has made or caused to be made, and continues to make, in violation of Business and

20   Professions Code § 17500, numerous untrue or misleading statements before the public in this

21   District and elsewhere in the State of California.  Such statements include, but are not limited to,

22   the following categories as further described in paragraph 85 above: portraying its diesel

23   vehicles as "clean," with low emissions, in compliance with state and federal emissions

24   standards, and as environmentally friendly; representing that its vehicles would retain a high

25   resale value, would provide better fuel economy than what was displayed on the Monroney Fuel

26   Economy Label; and other deceptive representations as described in this Complaint.  These

27   statements and omissions constitute unfair, deceptive, untrue, and misleading advertising under §

28   17500.

230.     Volkswagen knew, or by the exercise of reasonable care should have known, that the statements or omissions were untrue or misleading at the time such statements were made.

231.     Volkswagen's false advertising harmed California consumers.

232.     Volkswagen took actions to conceal its wrongful conduct, until they could no longer deny, and did finally admit to CARB the illegal use of defeat devices to circumvent emissions testing in September 2015.

<b>FOURTEENTH CAUSE OF ACTION</b><br>
<b>(Violations of False Advertising Law, Bus. & Prof. Code § 17500)</b><br>
<b>[By CAAG on Behalf of the People of the State of California Against Porsche]</b>

233.     Plaintiff incorporates and realleges paragraphs 1 through 226, inclusive, as if set forth here in full.

234.     Porsche, and each of them, have engaged in acts or practices that constitute false advertising as defined in California Business and Professions Code § 17500.

235.     Beginning at a date unknown to Plaintiff and continuing to the present, Porsche with the intent to induce California consumers to purchase or lease the Subject Vehicles, have made or caused to be made, and continue to make, in violation of Business and Professions Code § 17500, numerous untrue or misleading statements before the public in this District and elsewhere in the State of California.  Such statements include, but are not limited to, the following categories as further described in paragraph 85.b. above: portraying its diesel vehicles as being in compliance with state and federal emissions standards, and other deceptive representations as described in this Complaint.  These statements and omissions constitute unfair, deceptive, untrue, and misleading advertising under § 17500.

236.     Porsche knew, or by the exercise of reasonable care should have known, that the statements or omissions were untrue or misleading at the time such statements were made.

237.     Porsche's false advertising harmed California consumers.

<b>FIFTEENTH CAUSE OF ACTION</b><br>
<b>(Untrue, Deceptive, or Misleading Environmental Marketing, Bus. & Prof. Code § 17580.5)</b><br>
<b>[By CAAG on Behalf of the People of the State of California Against Volkswagen]</b>

238.     Plaintiff incorporates and realleges paragraphs 1 through 226, inclusive, as if set forth here in full.

239.   California Business and Professions Code § 17580.5 makes it "unlawful for any person to make any untruthful, deceptive, or misleading environmental marketing claim, whether explicit or implied."

240.   Beginning at a date unknown to Plaintiff and continuing to the present, Volkswagen, and each of them, have engaged in making untruthful, deceptive, or misleading environmental marketing claims prohibited by California Business and Professions Code § 17580.5.  Such statements include, but are not limited to, the following categories as further described in paragraph 85.a.-85.c. and 85.e. above: portraying its diesel vehicles as "clean," with low emissions, in compliance with state and federal emissions standards, and as environmentally friendly, representing that the vehicles would provide better fuel economy than that displayed on the Monroney Fuel Economy Label, and other deceptive representations as described in this Complaint.  Volkswagen's false statements and omissions constitute untruthful, deceptive, or misleading environmental marketing claims.

241.   Volkswagen's untruthful, deceptive, and misleading environmental marketing claims harmed California consumers.

242.   Volkswagen's untruthful, deceptive, or misleading environmental marketing claims were designed to induce California consumers to purchase or lease light-duty diesel vehicles from Volkswagen, and were made in this District and elsewhere in the State of California.

### SIXTEENTH CAUSE OF ACTION
**(Violations of Unfair Competition Law, Bus. & Prof. Code § 17200)**
**[By CAAG on Behalf of the People of the State of California Against All Defendants]**

243.   Plaintiff incorporates and realleges paragraphs 1 through 242, inclusive, as if set forth here in full.

244.   The Unfair Competition Law ("UCL"), California Business and Professions Code § 17200, provides that "unfair competition shall mean and include unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising, and any act prohibited by" Business and Professions Code § 17500.

54

245.    Defendants have engaged in the following unlawful acts, among others, each of which constitute acts of unfair competition in violation of Business and Professions Code § 17200:

a.    Volkswagen's actions constitute multiple violations of 12 U.S.C. § 5536, as alleged in the First Cause of Action in paragraphs 127 through 141, which allegations are incorporated herein as if set forth in full.

b.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43151 as alleged in the Second Cause of Action in paragraphs 142 through 146, which allegations are incorporated herein as if set forth in full.

c.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43152 as alleged in the Third Cause of Action in paragraphs 147 through 150, which allegations are incorporated herein as if set forth in full.

d.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43153 as alleged in the Fourth Cause of Action in paragraphs 151 through 155, which allegations are incorporated herein as if set forth in full.

e.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code §§ 43016 and 43205 and the requirements in 13 C.C.R. § 2037 as alleged in the Fifth Cause of Action in paragraphs 156 through 160, which allegations are incorporated herein as if set forth in full.

f.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43211 and the requirements in 13 C.C.R. §§ 1961 and 1961.2 as alleged in the Sixth Cause of Action in paragraphs 161 through 166, which allegations are incorporated herein as if set forth in full.

g.    Volkswagen's and Porsche's actions constitute multiple violations of Health & Safety Code § 43212 and the requirements in 13 C.C.R. §§ 1961 and 1961.2 as alleged in the Seventh Cause of Action in paragraphs 167 through 177, which allegations are incorporated herein as if set forth in full.

1    h.      Volkswagen's and Porsche's actions constitute multiple violations of Health &

2    Safety Code § 43016 and the requirements in 13 C.C.R. § 1965 as alleged in the Eighth Cause of

3    Action in paragraphs 178 through 194, which allegations are incorporated herein as if set forth in

4    full.

5    i.      Volkswagen's and Porsche's actions constitute multiple violations of Health &

6    Safety Code § 43016 and the requirements in 13 C.C.R. § 1903 as alleged in the Ninth Cause of

7    Action in paragraphs 195 through 199, which allegations are incorporated herein as if set forth in

8    full.

9    j.      Volkswagen's actions constitute multiple violations of Health & Safety Code

10   § 43016 and the requirements in 13 C.C.R. § 1903 as alleged in the Tenth Cause of Action in

11   paragraphs 200 through 205, which allegations are incorporated herein as if set forth in full.

12   k.      Volkswagen actions constitute multiple violations of Health & Safety Code

13   § 43016 and the requirements in 13 C.C.R. § 1968.2 as alleged in the Eleventh Cause of Action in

14   paragraphs 206 through 210, which allegations are incorporated herein as if set forth in full.

15   l.      Volkswagen's actions constitute a continuing nuisance throughout California

16   pursuant to California Civil Code §§ 3479 and 3480 in violation of California Civil Code § 3494

17   as alleged in the Twelfth Cause of Action in paragraphs 211 through 226, which allegations are

18   incorporated herein as if set forth in full.

19   m.      Volkswagen's actions constitute multiple violations of Business and Professions

20   Code § 17500 as alleged in the Thirteenth Cause of Action in paragraphs 227 through 232, which

21   allegations are incorporated herein as if set forth in full.

22   n.      Porsche's actions constitute multiple violations of Business and Professions Code

23   § 17500 as alleged in the Fourteenth Cause of Action in paragraphs 233 through 237, which

24   allegations are incorporated herein as if set forth in full.

25   o.      Volkswagen's actions constitute multiple violations of Business and Professions

26   Code § 17580.5 as alleged in the Fifteenth Cause of Action in paragraphs 238 through 242, which

27   allegations are incorporated herein as if set forth in full.

28

p.    Volkswagen's and Porsche's actions constitute multiple violations of California Civil Code § 1770.  Section 1770 sets out a list of "unfair methods of competition and unfair or deceptive acts or practices," which, when "undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful." Cal. Civ. Code § 1770(a).  Volkswagen's and Porsche's false and misleading representations to, and/or omissions from, consumers about the qualities and characteristics of their diesel vehicles alleged in this complaint constitute multiple violations of California Civil Code § 1770 when made in connection with transactions that were intended to result, or did result, in the sale or lease of Volkswagen's and Porsche's diesel vehicles.  Specifically, Volkswagen engaged in the following prohibited acts set forth in subparagraphs (i)-(v) and Porsche engaged in the following prohibited acts as set forth in subparagraphs (i)-(iii) and (v):

(i.)    § 1770(a)(2): "Misrepresenting the source, sponsorship, approval, or certification of goods or services."

(ii.)    § 1770(a)(5): "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he or she does not have."

(iii.)    § 1770(a)(7): "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."

(iv.)    § 1770(a)(9): "Advertising goods or services with intent not to sell them as advertised."

(v.)    § 1770(a)(16): "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

246.    In addition to the unlawful acts described in the prior paragraph, Volkswagen and Porsche have engaged in the following unfair and fraudulent acts, among others, in violation of Business and Professions Code § 17200:

a.    Each of the unlawful acts set forth in the preceding paragraph; and

57

b.      All of Defendants' misconduct alleged in this Complaint in connection with the sale and lease of the Subject Vehicles, in that Defendants' misconduct harmed the market for ZEV and PZEV vehicles and placed Volkswagen's competitors at an unfair disadvantage.

## PRAYER FOR RELIEF

WHEREFORE, the People request that the Court enter a judgment against Defendants as follows:

247.    As to Defendant Volkswagen, that the Court provide, pursuant to 12 U.S.C. § 5565:

a.      rescission of all sales and lease contracts for all consumers in California of vehicles with defeat devices;

b.      refund of all moneys paid by consumers in California of vehicles with defeat devices;

c.      restitution of all moneys paid by consumers in California of vehicles with defeat devices;

d.      disgorgement of all profits or compensation for unjust enrichment to all consumers in California of vehicles with defeat devices;

e.      payment of damages or other monetary relief to all consumers in California of vehicles with defeat devices;

f.      public notification regarding the violation, including the costs of notification; and

g.      appropriate further injunctive requirements or prohibitions to prevent further or ongoing violations of law.

248.    That pursuant to Health and Safety Code § 43017, Defendants Volkswagen and Porsche be enjoined from violations of the Health and Safety Code and CARB regulations relating to vehicular air pollution control, and in particular from further importing or delivering new motor vehicles for sale, lease, or rental in California which were not validly certified by CARB, and further selling or offering to sell, leasing or offering to lease, or renting or offering to rent in California, new motor vehicles which have not been validly certified by CARB, including any violation of Health and Safety Code §§ 43151, 43152, 43153, 43205 and 43211

1    and 13 C.C.R. §§ 1903, 1961, 1961.2, 1965, 1968.2, and 2037.

2         249.    That pursuant to Health and Safety Code § 43154, the Court impose civil penalties

3    of up to $5,000 per affected vehicle against Defendants Volkswagen and Porsche for each

4    violation of Health and Safety Code §§ 43151, 43152, and 43153.

5         250.    That pursuant to Health and Safety Code § 43211, the Court impose the mandatory

6    civil penalty of $5,000 against Defendants Volkswagen and Porsche for each sale of, offer to

7    sell, action which caused an offer to sell, or attempt to sell an affected vehicle that does not

8    comply with the applicable emissions standards, including those set forth in 13 C.C.R. §§ 1961

9    and 1961.2.

10        251.    That pursuant to Health and Safety Code § 43212, the Court impose civil penalties

11   of $50 against Defendants Volkswagen and Porsche for each affected vehicle for each failure to

12   comply with the emissions standards and test procedures set forth in 13 C.C.R. §§ 1961 and

13   1961.2.

14        252.    That pursuant to Health and Safety Code § 43016, the Court impose a civil penalty

15   of up to $500 per affected vehicle against Defendants Volkswagen and Porsche for each

16   violation of Health and Safety Code § 43205 and 13 C.C.R. § 2037.  California Health and

17   Safety Code § 43016 provides that any person who violates any provision of Division 26, Part 5

18   (Health & Saf. Code §§ 43000-44299.91, Vehicular Air Pollution Control), or any order, rule, or

19   regulation of CARB adopted pursuant to Part 5, and for which violation there is not provided in

20   Part 5 any other specific civil penalty or fine, shall be subject to a civil penalty not to exceed

21   $500 per vehicle.  Part 5 does not specify a civil penalty or fine for violations of Health and

22   Safety Code § 43205 or 13 C.C.R. § 2037.

23        253.    That pursuant to Health and Safety Code § 43016, the Court impose a civil penalty

24   of up to $500 per affected vehicle against Defendants Volkswagen and Porsche for each

25   violation of 13 C.C.R. §§ 1903, 1965, and 1968.2.  California Health and Safety Code § 43016

26   provides that any person who violates any provision of Division 26, Part 5 (Health & Saf. Code

27   §§ 43000-44299.91, Vehicular Air Pollution Control), or any order, rule, or regulation of CARB

28   adopted pursuant to Part 5, and for which violation there is not provided in Part 5 any other

59

specific civil penalty or fine, shall be subject to a civil penalty not to exceed $500 per vehicle. Part 5 does not specify a civil penalty or fine for violations of 13 C.C.R. §§ 1903, 1965, and 1968.2.

254.    That pursuant to California Code of Civil Procedure § 3494 Volkswagen be ordered and enjoined to abate the public nuisance that exists within the State of California.

255.    That the Court assess a civil penalty of $2,500 against Defendants Volkswagen and Porsche for each violation of Business and Professions Code § 17500 in an amount according to proof, under the authority of Business and Professions Code § 17536.

256.    That the Court assess a civil penalty of $2,500 against Defendant Volkswagen for each violation of Business and Professions Code § 17580.5 in an amount according to proof, under the authority of Business and Professions Code § 17536.

257.    That pursuant to California Business and Professions Code § 17535, Defendants Volkswagen and Porsche be permanently enjoined from making any false or misleading statements in violation of Business and Professions Code §§ 17500 and 17580.5 as alleged in this Complaint.

258.    That the Court make such orders or judgments as may be necessary to prevent the use or employment by any Defendant of any practice that constitutes unfair competition or as may be necessary to restore to any person in interest any money or property that may have been acquired by means of such unfair competition, under the authority of Business and Professions Code § 17203.

259.    That the Court assess a civil penalty of $2,500 against Defendants Volkswagen and Porsche for each violation of Business and Professions Code § 17200 in an amount according to proof, under the authority of Business and Professions Code § 17206.

260.    In addition to any penalty assessed under Business and Professions Code § 17206, that the Court assess a civil penalty of $2,500 against Defendants Volkswagen and Porsche for each violation of Business and Professions Code § 17200 perpetrated against a senior citizen or disabled person, in an amount according to proof, under the authority of Business and Professions Code § 17206.1.

1        261.    That Plaintiff recovers its costs of suit herein, including costs of investigation and

2   attorneys' fees.

3        262.    All such other and further relief as the Court deems just and proper.

4   Dated:  June 27, 2016                              Respectfully Submitted,

5                                                      KAMALA D. HARRIS
                                                       Attorney General of California
6                                                      NICKLAS A. AKERS
                                                       SALLY MAGNANI
7                                                      ROBERT W. BYRNE
                                                       Senior Assistant Attorneys General
8                                                      JUDITH A. FIORENTINI
                                                       DAVID A. ZONANA
9                                                      GAVIN G. MCCABE
                                                       Supervising Deputy Attorneys General
10

11                                                     /s/ JON WORM
                                                       JON WORM
12                                                     Deputy Attorney General
                                                       *Attorneys for Plaintiff the People of the*
13                                                     *State of California*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28